[Civ. No. 22796. First Dist., Div. One. Sept. 23, 1966.]

COW HOLLOW IMPROVEMENT CLUB et al., Plaintiffs and Respondents, v. BOARD OF PERMIT APPEALS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents; LENA DiBENE et al., Real Parties in Interest and Appellants.

William L. Ferdon and Chickering & Gregory for Real Parties in Interest and Appellants.

Charles R. Martin, City Attorney (San Marino), as Amici Curiae on behalf of Real Parties in Interest and Appellants.

No appearance for Defendants and Respondents.

Caspar W. Weinberger, M. Laurence Popofsky and Heller, Ehrman, White & McAuliffe for Plaintiffs and Respondents.

Thomas M. O'Connor, City Attorney (San Francisco), and Robert A. Kenealey, Deputy City Attorney, as Amici Curiae on behalf of Plaintiffs and Respondents.

MOLINARI, J.—This is an appeal by Lena and Lorenzo DiBene (hereafter referred to as DiBene) from the judgment of the trial court in favor of Cow Hollow Improvement Club and its members (hereafter referred to collectively as the "Club") ordering that a writ of mandate issue compelling the Board of Permit Appeals of the City and County of San Francisco and the individual commissioners and officers thereof (hereafter referred to collectively as the "Board") to set aside its order granting permission to DiBene to construct a two-family dwelling on the property which is owned by him and is zoned "R-1"; further compelling the Board to enter a new order affirming the decision of the Zoning Administrator, which decision denied DiBene's application for a zoning variance; and finally compelling the Department of Public Works, its director, and the Zoning Administrator to disapprove any building permit application filed by DiBene in relation to his proposal to construct such a dwelling on the subject property. DiBene's sole contention on this appeal is that the trial court erred in compelling the Board to set aside its decision granting him the requested variance.

### Procedural Background

In the early months of 1964 DiBene, the owner of a parcel of property on the north side of Filbert Street near Scott Street in San Francisco, applied to the Zoning Administrator for a zoning variance "to construct a two-family dwelling on said lot which has an area of 3437.5 sq. ft., at a ratio of one dwelling unit for each 1718.75 sq. ft. where one dwelling unit for each 3000 sq. ft. is the maximum number otherwise permitted whenever more than one unit is placed on a lot in an R-1 district." On June 26, 1964, after holding a public hearing on DiBene's application, the Zoning Administrator denied the

application on the ground that none of the five conditions which, according to section 302(d) of the City Planning Code,[1] must be met in order to justify the granting of a zoning variance were satisfied in the instant case. From this decision, DiBene subsequently filed a notice of appeal to the Board.[2] On September 21, 1964, after the Board had held two hearings in relation to DiBene's application and after its members had made an inspection of DiBene's lot and the surrounding property, the Board disapproved the decision of the Zoning Administrator and ordered that DiBene be granted permission to construct a two-family dwelling on the subject property. In conjunction with its decision the Board made findings of fact to the effect that all of the five conditions required by section 302(d) of the Planning Code for the granting of a variance had been met in the instant case.

On October 28, 1964, following the Board's refusal to grant a rehearing, the Club commenced this proceeding in mandamus, seeking to set aside the Board's decision. Following the issuance of the alternative writ and the various returns to the writ by way of answer, the matter came on for hearing before the court below. At the conclusion of the hearing the trial court made findings of fact to the effect that three of the Board's findings in relation to its order granting DiBene's application for a variance were not supported by the evidence adduced before the Board. Accordingly, by way of a conclusion of law, the trial court determined that the Board, in

[1]Section 302(d) of the City Planning Code, contained in part II, ch. II, of the San Francisco Muncipal Code, provides as follows: "The Zoning Administrator shall grant the requested variance in whole or in part if, from the facts presented in connection with the application, or at the public hearing,' or determined by investigation, it appears and the Zoning Administrator specifies in his findings the facts which establish: (1) that there are exceptional or extraordinary circumstances or conditions applying to the property involved, or to the intended use of the property, that do not apply generally to other property or uses in the same class of district; (2) that owing to such exceptional or extraordinary circumstances the literal enforcement of specified provisions of the Code would result in practical difficulty or unnecessary hardship; (3) that the variance is necessary for the preservation of a substantial property right of the petitioner possessed by other property in the same class of district; (4) that the granting of the variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity; and (5) that the granting of such variance will be in harmony with the general purpose and intent of this Code and will not adversely affect the Master Plan."

[2]Section 117.3 of the San Francisco Charter and § 303(a) of the City Planning Code provide that appeals may be taken from the determination of the Zoning Administrator and that an appeal stays all proceedings in furtherance of the action appealed from.

granting permission to DiBene to construct a two-family dwelling on the subject property, had acted in excess of its jurisdiction. The court thereupon entered judgment in favor of the Club and it is from this judgment that DiBene appeals.

## Scope of Review

Adverting first to the power of the Zoning Administrator we note that by virtue of section 117.3 of the San Francisco Charter and section 302(d) of the Planning Code (hereafter referred to as the "Charter" and the "Code") the initial determination as to whether a variance should be granted or denied is vested in the Zoning Administrator, who is empowered to grant such a variance only upon finding that the conditions of these enactments have been satisfied.[3]

---

[3]Section 302(d) of the Code, which we have set out in fn. 1, was apparently enacted as an implementation of § 117.3 of the Charter, which, although enacted in 1948, became operative on May 2, 1960, simultaneously with the effective date of the Code. (See § 117 of the Charter.) Section 117.3 provides in pertinent part as follows: "The zoning administrator shall receive, investigate, hear and determine all applications for variances from the strict application of the provisions of the aforesaid ordinances. The board of supervisors shall establish by ordinance the procedure for action on such matters, including the manner by which notice of time and place of hearings shall be given. The zoning administrator shall have power to grant only such variances as may be in harmony with the general purpose and intent of said ordinances and in accordance with the general and specific rules therein contained, subject to such conditions and safeguards as he may impose. He shall have authority to grant such variances only when the strict and literal interpretation and enforcement of the provisions of said ordinances would result in practical difficulties, unnecessary hardships or results inconsistent with the general purposes of the zoning regulations. Before any such variance may be granted, there shall appear, and the zoning administrator shall specify in his findings, the facts in each case which shall establish: (1) That there are exceptional or extraordinary circumstances or conditions applying to the property involved or to the intended use of the property that do not apply generally to the property or class of uses in the same district or zone; (2) That such variance is necessary for the preservation and enjoyment of a substantial property right of the petitioner, possessed by other property in the same zone and vicinity; and (3) That the granting of such variance will not be materially detrimental to the public welfare or injurious to the property or improvements in such zone or district in which the property is located."

We note that in § 117.3 it is provided that the Zoning Administrator shall specify in his findings facts establishing three conditions, while § 302(d) provides that he shall specify facts establishing five conditions. Conditions (1), (3) and (4) of § 302(d) correspond substantially with conditions (1), (2) and (3), respectively, of § 117.3. Conditions (2) and (5) of § 302(d) were apparently based upon the language of § 117.3 delineating the authority of the Zoning Administrator, which language is set out therein prior to the specification of the three conditions upon which findings of fact are required to be made. The subject language,

■ The determination of the Zoning Administrator is not final, however, if an appeal is taken therefrom to the Board as provided in section 117.3 of the Charter. ■ Upon the taking of such an appeal, pursuant to the provisions of section 117.3 of the Charter and section 303 of the Code, the Board is not bound by the Zoning Administrator's findings or his decision but may approve, disapprove, or modify the ruling, decision or determination appealed from, "or, in lieu thereof, make such other additional determination as it shall deem proper in the premises, subject to the same limitations" as are placed upon the Zoning Administrator by the Charter and the Code.[4]

providing that the Zoning Administrator shall grant variances ''only when the strict and literal interpretation and enforcement of the provisions of said ordinances would result in practical difficulties, unnecessary hardships *or* results inconsistent with the general purposes of the zoning regulations'' (emphasis added), does not specify that findings of fact establishing these requirements shall be made. It would appear that these requirements are conclusions which the Zoning Administrator is authorized to reach provided the three conditions specified in § 117.3 are met. We also note that the subject requirements are stated in the alternative and that when they were carried into § 302(d) as conditions (2) and (5) they were stated in the *conjunctive*. As already indicated under § 117.3, the Board, in granting a variance, is subject to the same limitations as are placed upon the Zoning Administrator. However, since no claim is made by any of the parties that § 302(d) does not harmonize with the Charter (see *Marculescu* v. *City Planning Com.*, 7 Cal.App.2d 371, 373 [46 P.2d 308]), and since the parties, the Zoning Administrator, the Board and the trial judge have proceeded on the basis that the subject variance could only be granted if the five conditions provided in § 302(d) were satisfied, we shall likewise consider whether the Board was justified in granting a variance to DiBene upon the basis that the five conditions of the ordinance were satisfied.

[4] With respect to the power of the Board to act on variances, § 117.3 of the Charter provides as follows: ''The board of permit appeals shall have and exercise the following powers: (a) To hear and determine appeals where it is alleged there is error or abuse of discretion in any order, requirement, decision or determination made by the zoning administrator in the enforcement of the provisions of any ordinance adopted by the board of supervisors creating zoning districts or regulating the use of property in the city and county; (b) To hear and determine appeals from the rulings, decisions and determinations of the zoning administrator granting or denying applications for variances from any rule, regulation, restriction or requirement of the zoning or set-back ordinances, or any section thereof. Upon the hearing of such appeals said board may affirm, change, or modify the ruling, decision or determination appealed from, or, in lieu thereof, make such other additional determination as it shall deem proper in the premises, subject to the same limitations as are placed upon the zoning administrator by this charter or by ordinance.''

Section 303(d) of the Code provides as follows: ''Upon the hearing of any such appeal said board, committee or agency may approve, disapprove, or modify the ruling, decision or determination appealed from or, in lieu thereof, make such other additional determination as it shall deem proper in the premises, subject to the same limitations as are placed

██ It is well settled that the Board, in the exercise of its appellate jurisdiction, is invested with complete power to hear and determine the entire controversy before it, is free to draw its own conclusions from the conflicting evidence before it and in the exercise of its independent judgment in the matter to affirm, modify, or overrule the action of the subordinate agency or official at the primary level. (*City & County of San Francisco* v. *Superior Court*, 53 Cal.2d 236, 248 [347 P.2d 294]; *Lindell Co.* v. *Board of Permit Appeals*, 23 Cal.2d 303, 313-314 [144 P.2d 4]; *Iscoff* v. *Police Com.*, 222 Cal.App.2d 395, 409 [35 Cal.Rptr. 189]; *Board of Permit Appeals* v. *Central Permit Bureau*, 186 Cal.App.2d 633, 640 [9 Cal.Rptr. 83]; *Greif* v. *Dullea*, 66 Cal.App.2d 986, 998-999, 1006 [153 P.2d 581].) DiBene argues, however, that pursuant to section 39 of the Charter the Board in the instant case was empowered to exercise full discretion in passing upon the matter submitted to it for decision.[5] ██ While it is true that the Board is vested with such broad discretionary power in its appellate jurisdiction having to do with appeals relating to permit and licensing matters (as to the extent of this power, see *Board of Permit Appeals* v. *Central Permit Bureau, supra*, p. 640; *Lindell Co.* v. *Board of Permit Appeals, supra*, pp. 313-314), we are of the opinion that in determining appeals relating to variances the Board's power is governed by section 117.3 of the Charter and section 303 of the Code rather than by section 39 of the Charter. In the first place, the very language of section 39 impels the conclusion that this section deals solely with the

---

upon the Zoning Administrator by this Code or by the City Charter. If the decision of the said board, committee or agency differs from that of the Zoning Administrator, it shall, in its decision, specify wherein there was error in the interpretation of the provisions of this Code, or abuse of discretion on the part of the Administrator, and shall specify in its findings the facts relied upon in making such determination. . . .''

[5]Section 39 of the Charter provides in relevant part as follows: ''Any applicant for a permit or license who is denied such permit or license by the department authorized to issue same, or whose license or permit is ordered revoked by any department, or any person who deems that his interests or property or that the general public interest will be adversely affected as the result of operations authorized by or under any permit or license granted or issued by any department, may appeal to the board of permit appeals. Such board shall hear the applicant, the permit-holder, or other interested parties, as well as the head or representative of the department issuing or refusing to issue such license or permit, or ordering the revocation of same. After such hearing and such further investigation as the board may deem necessary, it may concur in the action of the department authorized to issue such license or permit, or, by the vote of four members, may overrule the action of such department and order that the permit or license be granted, restored or refused.''

Board's appeal powers as to the granting or revoking of licenses and permits and has no bearing on the matter of the Board's role and power in granting or denying zoning variances. Secondly, prior to 1960 and the enactment of the Code, the Board, whose appeal powers were governed solely by the provisions of section 39, had no jurisdiction in the matter of granting or denying variance applications. It was only with the enactment of the Code that the Board was granted this power by virtue of section 117.3 of the Charter. And since this section of the Charter and the implementing provisions of the Code not only specifically empower the Board to hear and determine appeals relating to applications for zoning variances but also contain detailed provisions as to the manner by which such determinations are to be made, it follows that these provisions were intended to control as to the Board's power in matters relating to zoning variances.

We are persuaded, moreover, that the discretionary power conferred upon the Board was not intended to apply to the Board in its role of determining appeals relating to zoning variances because of the detailed provisions contained in section 303 of the Code relative to the procedure to be followed by the Board in determining variance appeals. Thus, under the latter code section, if the decision of the Board differs from that of the Zoning Administrator, the Board must specify the error or abuse of discretion on the part of the Zoning Administrator and "shall specify in its findings the facts relied upon in making such determination." No similar requirement attends the Board's appellate role in the purely discretionary area of permits and licenses. Indeed, the absence of the necessity for findings was one of the factors which the Supreme Court took into consideration in determining in the *Lindell* case that the Board possessed great discretion in permit and license matters.

We conclude, therefore, for the reasons above discussed that the jurisdiction of the Board insofar as variance matters are concerned is governed exclusively by section 117.3 of the Charter and section 303 of the Code. Accordingly, within the purview of these sections, the Board, in hearing appeals from the Zoning Administrator's decisions relating to the granting or denying of a variance, is entitled to exercise its own independent judgment but in doing so can only grant a variance if it finds that the conditions specified in these sections are satisfied.

■ This being the extent of the Board's power in variance matters, it is clear that in a mandate proceeding to review a decision of the Board granting a variance, the Board's determination must be sustained if it is supported by substantial evidence. (*Iscoff* v. *Police Com., supra,* p. 410; *Greif* v. *Dullea, supra,* p. 1007; see Code Civ. Proc., § 1094.5, subd. (c); and see *Jackson* v. *City of San Mateo,* 148 Cal.App.2d 667, 669 [307 P.2d 451]; *Bradbeer* v. *England,* 104 Cal.App.2d 704, 710 [232 P.2d 308]; *Miller* v. *Planning Com.,* 138 Cal.App.2d 598, 604 [292 P.2d 278].) ■ Accordingly, in such an action the trial court must determine whether the Board's findings as to each of the conditions requisite to the granting of a variance are supported by substantial evidence. When the superior court has rendered its judgment on mandamus and the judgment is appealed, the appellate court is likewise governed by the substantial evidence rule, i.e., the appellate court, resolving any reasonable doubts in favor of the Board's findings, must determine whether the evidence before the Board, viewed in the light most favorable to the respondent, sustains the findings under review. (*Le Strange* v. *City of Berkeley,* 210 Cal.App.2d 313, 321 [26 Cal.Rptr. 550].) ■ In making this determination in cases such as the instant one, where the trial court is called upon to review a decision of a local administrative agency and cannot exercise independent judgment, the appellate court is confined to the evidence in the agency record in determining whether the agency's findings are supported by substantial evidence. (*Le Strange* v. *City of Berkeley, supra,* p. 321; *Thain* v. *City of Palo Alto,* 207 Cal. App.2d 173, 193 [24 Cal.Rptr. 515]; *Endo* v. *State Board of Equalization,* 143 Cal.App.2d 395, 399 [300 P.2d 366]; *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 309 [196 P.2d 20].)

■ In the case at bench we note that the court below made findings of fact. Such findings were unnecessary for the reason that since the trial court was not exercising de novo powers there was no trial on any issue of fact but only the trial of an issue of law. (*Estate of Kearns,* 129 Cal.App.2d 832, 835 [278 P.2d 85]; *Wheeler* v. *Board of Medical Examiners,* 98 Cal. App. 267, 268 [276 P. 1119]; see *Davis* v. *State Board of Optometry,* 35 Cal.App.2d 428, 433 [95 P.2d 959].) It is apparent, however, that while the trial court did make findings of fact it did not purport to exercise its independent judgment but merely determined that certain of the Board's findings

were not supported by substantial evidence. The trial court specifically determined that "there is no evidence to support any of the findings of fact set forth above" (these being the first three findings of the Board), and on this basis alone the trial court concluded that the Board had acted in excess of its jurisdiction in granting DiBene's application for a variance. Accordingly, in determining the propriety of the trial court's judgment based upon its conclusion that the Board's findings were not supported by substantial evidence we are required to look to the findings of the Board alone without consideration for the purported findings of the court below.

## The Facts

In order to determine whether the findings of the Board are supported by substantial evidence we first set out the facts adduced before the Board. In this regard we note from the transcript of the proceedings before that body that the evidence consisted of the opinions and points of view of various persons including statements of the attorneys representing the involved parties. While such evidence does not measure up in quality to evidence normally introduced in judicial proceedings, we noted in *Iscoff*, involving the same administrative board as that in the instant case, that the rules of admissibility which are applicable in a court of law do not bind administrative agencies. (See Witkin, Cal. Evidence (1958) § 7, p. 7.) Taking cognizance of *Floresta, Inc.* v. *City Council*, 190 Cal. App.2d 599, 609 [12 Cal.Rptr. 182], wherein this court upheld the use of opinion evidence before an administrative board, we particularly noted in *Iscoff* the language of *Floresta* stating that the nature of the administrative process is such as to evoke presentation of evidence in the form of opinions and points of view of those who testify.

In the instant case the evidence before the Board consisted of the following: In 1948 the north and south sides of Filbert Street between Pierce and Scott Streets were rezoned from "second residential" to "first residential," the latter classification permitting the construction of only single-family dwellings. However, pursuant to a special stipulation provided for concurrently with such rezoning, a 100-foot frontage on the north side of Filbert Street was excepted from such "first residential" rezoning, this stipulation providing that two-family dwellings could be erected upon the lots included within said frontage. The unimproved lot involved in the instant proceedings, having a frontage of 25 feet, was one of

the lots included within the 100-foot frontage subject to this stipulation.

In 1952 DiBene acquired ownership of the subject lot, which he has continuously owned up to the present time. When the lot was acquired by him the stipulation respecting this lot was in effect. This stipulation continued in effect until May 2, 1960, when the City enacted a new comprehensive zoning ordinance which rezoned every parcel of property in San Francisco. (See Charter § 117.) In enacting the new zoning ordinance none of the property owners in San Francisco were given personal notice of the proposed code or of the effect of the new zoning regulations upon their property, the board of supervisors having decided, upon advice of the city attorney, that it was neither practical nor necessary to give personal notice. General notice of the proposed code was, however, given by publication in the newspapers.

Under the new Code DiBene's lot was rezoned as "R-1," which zoning classification permits the erection of one dwelling unit for each 3,000 square feet. (Code § 127.) Section 149 of the new Planning Code provided, however, that lots which were theretofore subject to special stipulations could be developed pursuant to such stipulation within two years of the effective date of the new Code. Accordingly, DiBene had the benefit of a 10-year period within which to erect a two-family dwelling on his lot, that is, from 1952 when he acquired the lot until May 2, 1962 when the two-year "grace period" provided for in section 149 of the Code expired. Of the four lots included within the 100 foot frontage subject to this special stipulation, the owners of two of these lots had taken advantage of the stipulation and erected two-family dwellings thereon prior to the expiration of the two-year "grace period."

DiBene was not personally notified by the city of the effect of the new Planning Code upon his property, nor was he personally apprised of the two-year "grace period" accorded him by section 149 of the Code. Not having received personal notice of the change in the zoning of his lot, DiBene, relying upon the special stipulation, presumed that because of the nature and character of the neighborhood no rezoning would take place. He "felt" that the special stipulations were "paramount to the . . . enactment of any ordinance."

Additional facts relating specifically to DiBene's property are as follows: On the block of Filbert Street where this

property is situated there is one multiple dwelling unit, a three-unit dwelling, and three two-unit dwellings. These are, however, nonconforming uses since both sides of this block of Filbert Street are zoned "R-1." In addition, the northern portion of the block on which DiBene's property is situated and the blocks adjacent to this block are zoned "R-3."[6] Finally, there was evidence presented to the Board to the effect that DiBene's total capital investment in the subject property was $20,000 and that this property, as presently zoned and without varying unit-area regulations, could be sold for approximately $50,000. However, there was also evidence presented that DiBene could not afford to use the subject property for a single-family dwelling.

### The Board's Findings

The Board's findings which we must analyze in the light of the foregoing facts are as follows: "The Board of Permit Appeals finds that there was error on the part of the Zoning Administrator pertaining to the five conditions of Section 302(d) of the Planning Code as set forth below and for the facts and reasons herein specified with regard to each condition:

"(1) That there are exceptional or extraordinary circumstances or conditions applying to the property involved, or to the intended use of the property, that do not apply generally to other property or uses in the same class of district:

"The appellants purchased the property in 1952 when it was located in an R-2 area. They were never given notice of any change, and they presumed justifiably that on the basis of the character of the neighborhood no rezoning would take place. The Zoning Administrator in his opinion indicates appellants gave evidence relating to the question whether the entire 'block should be reclassified R-2 rather than R-1.'

"(2) That owing to such exceptional or extraordinary circumstances the literal enforcement of specified provisions of the Code would result in practical difficulty or unnecessary hardship:

"The exceptional or extraordinary circumstances are found in the fact that the lot is located at the fringe of an R-1 area. The north portion of the block is R-3. The southern half of the block to the south is R-3. The block to the east is R-3. Immediately to the rear is an apartment house. The properties

---

[6]The "R-3" zoning classification apparently permits the construction of multiple-family dwellings.

immediately adjacent to the east and west are two-family dwellings, and the property directly across the street is a two-dwelling unit. There is no likelihood that anyone would employ the property for a single family dwelling.

"(3) That the variance is necessary for the preservation of a substantial property right of the petitioner, possessed by other property in the same class of district:

"The property was R-2 when purchased, and the appellants intend to use the premises as their home. They cannot afford to use the property for a single family dwelling, and the right of construction of two-family dwellings or more has been employed on this street. The only other owner of unimproved property wishes to develop that property in the same fashion as appellants.

"(4) That the granting of the variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity; and it will be completely consistent with the employment of properties on this particular block.

"(5) That the granting of such variance will be in harmony with the general purpose and intent of this Code and will not adversely affect the Master Plan.

"The character of the neighborhood would not be altered or affected in any way, and an excellent and distinguished building would be constructed which would enhance the neighborhood and eliminate the nuisances incident to an unimproved lot in the area. Construction of a two-family dwelling unit on this block with one multiple family dwelling unit and three other two-family dwelling units would not be in conflict with the designation of this area in the Master Plan as an area for low-density residential use."

### The Substantiality of the Evidence

Adverting to the rule that we must apply the substantial evidence test to the Board's findings, we reiterate that in the instant case *each* of the conditions provided for in section 117.3 of the Charter and section 302(d) of the Code must be supported by substantial evidence presented to the Board in order to warrant the granting of the variance which DiBene seeks.

Directing our attention initially to the first condition of section 302(d) of the Code,[7] namely, "that there are

---

[7]Unless otherwise indicated, all references are to the Code.

exceptional or extraordinary circumstances or conditions applying to the property involved, or to the intended use of the property, that do not apply generally to other property or uses in the same class of district," we note that the Board found that this factor was met as a result of the city's failure to notify DiBene of the enactment of the new zoning regulations. In considering this determination by the Board we point out that it is not contended by DiBene, nor was it urged by him below, that the notice given by the city was violative of any constitutional safeguards or other statutory requirements. ■■■ As to the constitutionality of this procedure, it is well established in California that where a zoning ordinance constitutes a completely new expression on the subject by the city planning commission and the local legislative body, affects every parcel of real property within the city, and thereby effects a repeal of all existing zoning ordinances, personal notice is not required to be given to the owners of every parcel of real property within the city. (*Wanamaker* v. *City Council*, 200 Cal.App.2d 453, 457-458 [19 Cal.Rptr. 554]; *Claremont Taxpayers Assn.* v. *City of Claremont*, 223 Cal.App.2d 589, 593 [35 Cal.Rptr. 907].)

DiBene contends, however, that his failure to receive personal notice of the zoning changes constituted an "exceptional or extraordinary circumstance" applicable to his property, which circumstance did not apply generally to other property in the same district or zone in which his lot is located. The evidence before the Board, however, established that no property owner in San Francisco received personal notice of the enactment of the new zoning regulations. Accordingly, this circumstance is not one that applies only to DiBene's property and does not "apply generally to other property . . . in the same class of district; . . ." In short, DiBene was precisely in the same position as all other property owners so far as notice is concerned. If DiBene were entitled to assert lack of notice as an exceptional circumstance in his case clearly every property owner in San Francisco would be similarly entitled to rely on the same circumstance as constituting exceptional circumstances justifying the granting of a variance. Thus, the new zoning regulations would be subject to evasion in every individual case and the new Planning Code would be rendered meaningless and ineffective.

While the absence of personal notice to DiBene constitutes the central consideration in the Board's finding on exceptional and extraordinary circumstances, the finding also refers to the

fact that DiBene "presumed justifiably" that no rezoning of his property would take place. In this connection the Board alludes to the purported fact that DiBene purchased the subject property in 1952 "when it was located in an R-2 area." Initially we note that the Board made a factual error in finding that DiBene's property was zoned "R-2" when he purchased it in 1952. Rather, the facts are that DiBene's property was then located in a "first residential zone"; that it had been so zoned since 1948; that it continued to be so zoned until 1960, when, by virtue of the enactment of the new Planning Code, the standards of a "first residential zone" were essentially incorporated into what was therein designated as an "R-1" classification; and that because of the special stipulation in the 1948 enactment and the "grace period" provided for in the 1960 enactment, the subject property, while zoned essentially for a single-family dwelling, enjoyed the special privilege of development as a two-family dwelling between 1948 and 1962. In any event, there is no legal justification for the Board's finding that DiBene "presumed justifiably" that no rezoning of his property would occur. We know of no principle of law which entitles a property owner to "presume justifiably" that there will be no change in the zoning laws existing at the time the particular property is purchased. Rather, it has been repeatedly held in California that a property owner does not acquire a vested right to develop his property in accordance with existing zoning regulations merely because he purchased the property in reliance upon prevailing use regulations. (*Anderson* v. *City Council*, 229 Cal.App.2d 79, 88-89 [48 Cal.Rptr. 41], and cases cited therein.) Thus DiBene, like all other property owners, assumed the risk that new zoning laws would alter the permissible use of his property after he acquired it. In view of the foregoing, we are constrained to hold that as a matter of law it cannot be said that DiBene's failure to receive personal notice of the change in his zoning classification constituted an "exceptional or extraordinary circumstance or condition" within the meaning and purview of the first condition set forth in sections 302(d) of the Code and 117.3 of the Charter.

 We turn next to the second factor which must be found under section 302(d) in order for a variance to be granted, this factor being that "owing to *such* exceptional or extraordinary circumstances the literal enforcement of speci-

fied provisions of the Code would result in practical difficulty or unnecessary hardship; . . ." (Italics added.) In finding that this condition was met in the instant case, the Board predicated its determination essentially upon the fact that DiBene's property is located on the fringe of an "R-1" area and there are a number of nonconforming uses on the block in which DiBene's property is situated, and upon the Board's conclusion that "There is no likelihood that anyone would employ the property for a single family dwelling." ▆▆▆ It should be here noted that the "exceptional or extraordinary circumstances" applicable to condition (2) of section 302(d) are those referred to in condition (1). The use of the adjective "such" in condition (2) clearly refers to the circumstances and conditions found to exist in condition (1). As we have already pointed out, the circumstances and conditions found to exist in the Board's first finding, which it specifically made applicable to condition (1) of section 302(d), were not the exceptional and extraordinary circumstances contemplated by the framers of that condition.

Even if, by liberally construing the Board's findings, we were to assume that the circumstances delineated in condition (2) were intended by the Board to be additional exceptional or extraordinary circumstances within the purview of condition (1), we nevertheless agree with the trial court's determination that none of these factors supports the Board's findings as to condition (1) or (2). In the first place, the finding that the subject lot is located at the fringe of an "R-1" area is not entirely accurate. Not only is it undisputed that the subject lot is situated *within* an "R-1" district in which there are located a substantial number of single-family dwellings, but also the adjoining zoning district to the west may be completely "R-1." ▆▆▆ In any event, the fact that the subject lot may be on the fringe of a zone in which all of the dwellings conform to the "R-1" classification and the fact that there may be multiple dwellings in the zone in which the subject lot is located are not exceptional or extraordinary circumstances within the meaning of condition (1) of section 302(d) because these circumstances apply generally to other parcels of property located in this zone.

▆▆▆ Moreover, the application by the Board of the "fringe concept" is merely an attempt by it to review the wisdom of the underlying zoning ordinance and is tantamount to an amendment of the zoning regulations in the guise of granting a variance. The creation of a zone is a legislative act

entrusted to the board of supervisors. Neither the Zoning Administrator nor the Board is empowered to review or amend the legislative decision. Were the ''fringe concept'' acceptable as justifying a variance, San Francisco's newly enacted zoning regulations would be rendered meaningless. Nor is it legally relevant that some of the property on the block where DiBene's lot is situated is developed in a manner which under the new Planning Code is not permissible. The structures on those properties persist in nonconformance with current law; they do not provide a justification for undermining the legislative determination that further development should be more strictly controlled. Were the Board empowered to rule otherwise, a tightening of zoning regulations by legislative decree could always be invalidated by administrative fiat.

With respect to the finding that condition (2) of section 302(d) was satisfied because ''There is no likelihood that anyone would employ the property for a single family dwelling,'' this factor might in and of itself constitute an extraordinary and exceptional circumstance applying to DiBene's property. However, not only is the record devoid of any evidence that the subject lot could not be put to a single-family use, but the record discloses that aside from the several parcels which do not conform to existing law the dwellings located on the north and south sides of Filbert Street in the subject zone are essentially single-family dwellings. Moreover, both of these sides of Filbert Street have been zoned essentially for single-family residences since 1948. In any event, even if there were evidence in the record to support the Board's finding that ''There is no likelihood that anyone would employ the property for a single family dwelling,'' the Board did not make the finding required by condition (2) that owing to this fact ''the literal enforcement of specified provisions of the Code would result in practical difficulty or unnecessary hardship; . . .'' Furthermore, there is no evidence that DiBene would suffer any unnecessary hardship if he were not granted a variance. The only showing made by him in this regard is that he ''can't afford to use it for a single family dwelling.'' Were such a circumstance sufficient to predicate unnecessary hardship every property owner would be justified in seeking a variance in order to make a more economically feasible use of his property. Not only does the record disclose that DiBene left the property unimproved for a period of 10 years during which he could have erected a two-

family dwelling on the subject lot, but it also affirmatively reveals that he would not suffer "practical difficulty or unnecessary hardship" if he were not permitted to construct a two-family dwelling on his property. In this regard the undisputed evidence is that DiBene's lot could be sold for development as presently zoned for $50,000, some $30,000 over his total investment in the lot. Accordingly, in view of the foregoing, we conclude that there was no evidence before the Board justifying its finding as to condition (2) of the requisites for a zoning variance set forth in section 302(d).

The third finding made by the Board applies to condition (3) of section 302(d), which provides that "the variance is necessary for the preservation of a substantial property right of the petitioner possessed by other property in the same class of district; . . ." The Board found that this condition was satisfied in the instant case upon the following facts: (1) DiBene's property was zoned "R-2" when he purchased it; (2) DiBene intends to use this property as his home and cannot afford to use it for a single-family dwelling; (3) there are other two-family dwellings on the block where DiBene's property is situated; and (4) "The only other owner of unimproved property wishes to develop that property in the same fashion" as DiBene. For the reasons hereinafter set out we hold that these facts do not constitute substantial evidence in support of the Board's finding that condition (3) has been satisfied.

As to the first of the facts so found, we have already concluded that a property owner has no vested right to develop his property in accordance with zoning laws in existence at the time of the property's acquisition. And as to the remaining three factors upon which the Board based its finding on condition (3), it is apparent that none deals with any substantial property right of which DiBene will be deprived if he is prevented from constructing a two-family dwelling on his property. The obvious purport of this condition is to provide relief by way of variance where the area of the property for which a variance is sought significantly exceeds that area provided for in the ratio of area per dwelling unit in a particular zone. In the instant case, since the area of DiBene's property is approximately 3,440 square feet, it does not significantly exceed the "R-1" standard of one dwelling unit per 3,000 square feet of lot area. Thus, DiBene would not be denied a substantial property right by limiting the use of his property to single-residence development. Nor is the variance

necessary to preserve a substantial property right not enjoyed by him but enjoyed by other property owners in the same zone. Each parcel in the zone, including those parcels on which nonconforming uses exist, is subject to the same standard of one dwelling unit per 3,000 square feet of lot area. The fact that the nonconforming uses enjoy a more favorable ratio of area per dwelling unit does not compel the extension of such nonconforming use to other property owners in the zone whose property is required to conform to the existing code. To allow this extension of nonconforming use by variance would do violence to the meaning and purport of the comprehensive zoning code and could result in a gradual whittling away of its objective by converting conforming uses into nonconforming uses. Here again we would have an amendment to the zoning code in the guise of a variance. ▆▆▆ In addition, it should be pointed out that these nonconforming uses achieved their present status at a time when such use was legal. Accordingly, they acquired a vested right of which they cannot be divested as long as such use is legally enjoyed. However, that vested right does not inure to the benefit of other property owners who do not have such a right. As to these other property owners the substantial property right possessed is the same and coequal; none enjoys a more favorable property right.

▆▆▆ Respecting the fourth finding of the Board covering condition (4) of section 302(d) that the granting of the subject variance will not be materially detrimental to the public welfare, will not materially injure property or improvements in the vicinity, and will be completely consistent with the employment of properties on this particular block, we are satisfied that this finding is sustained by substantial evidence. The evidence that there are already several multiple dwellings on the subject block, including two-flat dwellings on the same side of the block as DiBene's lot; that a building in keeping with the surrounding property would be built; and that the unsightliness of an unimproved lot would be eliminated suffices to sustain this finding as well as the specific finding that the character of the neighborhood would not be altered or affected.

▆▆▆ In regard to the finding as to condition (5) that the granting of the variance would be in harmony with the general purpose and intent of the new Code and that it would not affect the "Master Plan" contemplated by such Code, it is

apparent from what we have already stated with respect to conditions (1), (2) and (3) of section 302(d) that such a finding is not sustainable. The purpose of the "Master Plan" with respect to the north and south sides of the Filbert Street block on which the subject lot is located, as indicated by the fact that they have been zoned "R-1," was to create essentially a single-family dwelling street which would not be available for multiple dwellings unless the lot upon which such dwelling were to be located contained a ratio of 3,000 square feet for each dwelling. Accordingly, pursuant to this formula a lot would have to contain 6,000 square feet in order to permit the construction of a two-family dwelling. As we view the variance procedure here under discussion, it contemplates that if the five conditions provided for in section 302(d) are met a variance should be permitted, insofar as the square foot ratio is concerned, when such ratio requirement is substantially complied with. In the instant case the subject lot contains an area of 3,437.5 square feet. Since 6,000 square feet are normally required in an "R-1" zone for a two-family dwelling, it is mathematically evident that this lot lacks 2,562.5 square feet in order to meet the standard set by the general zoning ordinance. To put it another way, the square footage is only 437.5 over the 3,000 square foot requirement for each dwelling. ▮▮▮ While it is true that a variance sanctions a deviation from the standard set by the general zoning ordinance (*Bringle* v. *Board of Supervisors,* 54 Cal.2d 86, 88 [4 Cal.Rptr. 493, 351 P.2d 765]; *Rubin* v. *Board of Directors,* 16 Cal.2d 119, 124 [104 P.2d 1041]), it is equally settled that conditions may be attached to the granting of a variance in order to preserve the general purposes and intent of the zoning ordinance (*Rubin* v. *Board of Directors, supra,* p. 124). It appears reasonable to assume that in enacting the new Code the Board of Supervisors contemplated that before a variance deviating from the standard set by it to as large an extent as the instant variation be approved by the Board, all of the conditions which the Code specified as a condition precedent to the granting of such variance should be met. As we have already shown, only one of the five specified conditions was satisfied in the instant case.

The judgment is affirmed.

Sullivan, P. J., concurred.

SIMS, J.—I dissent. I agree with the conclusions of the majority that the jurisdiction of the Board of Permit Appeals

of the City and County of San Francisco—in the sense of authority to determine a cause in a particular way as distinguished from authority to entertain the cause—is circumscribed insofar as variance matters are concerned by the provisions contained in section 117.3 of the City Charter and in sections 302 and 303 of the City Planning Code. We are also in agreement that the Board's determination must be sustained if it is supported by substantial evidence.

The facts as set forth in the opinion correctly and fairly set forth the evidence before the administrative body. Differences arise in the interpretation and the legal effect to be given to those facts. These differences are engendered and promoted by the amphibological phraseology used by the Board in complying with its mandate to "specify in its findings the facts relied upon in making" a determination different from that of the Zoning Administrator. (Planning Code, § 303(d).)

"The Board of Permit Appeals finds that there was error on the part of the Zoning Administrator pertaining to the five conditions of Section 302(d) of the Planning Code as set forth below and for the facts and reasons herein specified with regard to each condition:

"(1) That there are exceptional or extraordinary circumstances or conditions applying to the property involved, or to the intended use of the property, that do not apply generally to other property or uses in the same class of district:

"The appellants purchased the property in 1952 when it was located in an R-2 area. They were never given notice of any change, and they presumed justifiably that on the basis of the character of the neighborhood no rezoning would take place. The Zoning Administrator in his opinion indicates appellants gave evidence relating to the question whether the entire 'block should be reclassified R-2 rather than R-1.' . . .''

The majority concedes that the applicants have never contended that the failure of the city to give or the failure of the applicants to acquire actual notice of the introduction and passage of the 1960 ordinance was violative of any constitutional safeguards or other statutory requirements. The authorities cited establish that no such notice is necessary where the entire city is embraced in the new ordinance as was the case in 1960. The opinion thereupon correctly concludes that the applicants' failure to receive personal notice of the change in his zoning classification cannot constitute an "exceptional or extraordinary circumstance or condition" within the meaning

of the provisions of the Charter and of the Code because everyone in San Francisco was similarly affected.

I would read more into the first finding. It states that the property was purchased in 1952 at a time when the requested use was permitted. (The finding erroneously states that the applicants' property was located in an area which was zoned R-2 at the time, when in fact it was one of four parcels excepted from the 1948 "first residential" zoning by a special stipulation.) It refers to the character of the neighborhood and to the fact that the Zoning Administrator had received evidence from the applicants relating to the question of whether the entire " 'block should be reclassified R-2 rather than R-1.' " I construe this as an imperfect attempt to show that the character of the neighborhood was also a factor giving rise to the circumstances and conditions on which the Board relied. Reference should be made to the findings as a whole.

The second finding reveals the character of the neighborhood. It recites in part: ". . . the lot is located at the fringe of an R-1 area. The north portion of the block is R-3. The southern half of the block to the south is R-3. The block to the east is R-3. Immediately to the rear is an apartment house. The properties immediately adjacent to the east and west are two-family dwellings, and the property directly across the street is a two-dwelling unit."

The majority acknowledges the possibility of the foregoing integrated interpretation of the facts, but rejects the competency of the facts found to sustain the conclusions predicated thereon. It is stated: "In any event, the fact that the subject lot may be on the fringe of a zone in which all of the dwellings conform to the 'R-1' classification and the fact that there may be multiple dwellings in the zone in which the subject lot is located are not exceptional or extraordinary circumstances within the meaning of condition (1) of section 302, subd. (d), because these circumstances apply generally to other parcels of property located in this zone."

The facts show that the block on which the property is situated is a wedge or bastion intruding into the general areas of less restrictive zoning which encompass the lots abutting on the block on the south, on the north and on the east. This condition does not necessarily apply generally to other property in the district to the west of the block. Concededly it applies generally to all lots within the block and alone would not suffice to justify the action of the Board. Examination of

the situation within the block discloses that the subject property itself is surrounded by existing two-family uses, which, although rendered nonconforming by the 1960 zoning, constitute circumstances and conditions which do not apply generally to all of the property on the block, much less the district.

In short, there are sufficient criteria to satisfy the provisions found in section 117.3 of the Charter, and in section 302(d) of the Code and re-echoed in finding "(1)" as set forth above. These criteria cannot be rejected, as the majority attempt to do, on the basis that "[w]ere the Board empowered to rule otherwise, a tightening of zoning regulations by legislative decree could always be invalidated by administrative fiat." If the legislative body desired no exceptions it would be easy to so provide. It is recognized that in comprehensive city-wide zoning, mistakes may be made and hardship unnecessarily imposed. The variance procedure was provided for just such a purpose. Someone must make the decision as to when a variance should be granted. Though the courts may agree with and approve of the ruling of the Zoning Administrator, they cannot substitute their judgment for that of the Board which reversed him where there is, as here, sufficient evidence to sustain its conclusion.

If the first finding is properly sustained the others fall into place. The unnecessary hardship is in requiring the applicants to suffer, not a less profitable use along with every other lot owner in the district, but a less profitable use than that enjoyed by their nonconforming neighbors on either side and across the street. The finding that "[t]here· is no likelihood that anyone would employ the property for a single family dwelling" must be viewed in its context. It must refer to the situation which would exist if there were any choice in the matter. Conversely if the zoning is upheld it is reasonable to conclude that a lot sandwiched in between two nonconforming uses will be less desirable than one on another block which is uniformly developed by single-family residences.

The property right of the applicants which is to be preserved is the right which they enjoyed before the 1960 zoning and which in enjoyed by their nonconforming neighbors. It is here that the actual notice to and knowledge of the applicants as to the enactment of a new zoning ordinance becomes material. A property owner who purchased after the enactment of the new ordinance could not contend that he had been

deprived of a substantial property right. Moreover, if it were shown that the applicants had actual notice of the 1960 changes and the moratorium period provided therein, it could be claimed that by their failure to improve the property within the time so provided they had waived any right to assert deprivation of a property right.

The opinion relies on the increase in value of the lot since the applicants purchased it as rebutting any showing of hardship or deprivation. Reflection indicates that it is not the increase or decrease in value of the lot over a period of time which is relevant and material, but the relative value of the lot, situated as it is, as compared with similar lots not so hemmed in.

The finding " [t]hat the granting of the variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity; and it will be completely consistent with the employment of properties on this particular block" is not attacked. The treatment given the property in the 1948 zoning, the character of the neighborhood, and the fact that the construction of the improvements sought was expressly countenanced in the period from 1960 to 1962 all reflect support for these conclusions.

Finally, it is stated that there is no support for the fifth finding which reads: "That the granting of such variance will be in harmony with the general purpose and intent of this Code and will not adversely affect the Master Plan." This conclusion is predicated upon the premise that the variance is not sustained in the other particulars. If those findings are, as contended herein, adequately buttressed by the unquestioned circumstances and conditions applying to the property involved, the requisite harmony would exist.

The conclusion that the application should not be granted is inconsistent with the principles expressed by this court in *Kappadahl* v. *Alcan Pac. Co.* (1963) 222 Cal.App.2d 626 [35 Cal.Rptr. 354]. Therein it is stated: "Appellants contend that the granting of the variance constitutes 'spot zoning.' However, spot zoning does not apply to a variance. As shown in *Rubin* v. *Board of Directors* (1940) 16 Cal.2d 119 [104 P.2d 1041], the variance 'procedure has been devised in order to minimize the acknowledged evils of "spot zoning" by amendment of the zoning ordinance. It provides the opportunity "for amelioration of unnecessary hardships which, owing to special conditions, would result from literal enforcement

of the restrictive features of the ordinance.'' (*Thayer* v. *Board of Appeals of City of Hartford,* 114 Conn. 15 [157 A. 273].) Of even more importance is the fact that in granting a variance, municipal authorities may usually attach conditions controlling the excepted use in accordance with the spirit and purposes of the general zoning plan. . . . Unlike the ''spot zoning'' obtained by amendment of the general zoning ordinance, a variance or exception sanctions a deviation from the standard under the dispensing power vested in the administrative body.' (P. 124.)'' (222 Cal.App.2d at p. 638; and see *Allen* v. *Board of Supervisors* (1966) 241 Cal.App.2d 158, 163-164 [50 Cal.Rptr. 444]; *Flagstad* v. *City of San Mateo* (1957) 156 Cal.App.2d 138, *passim,* and cases cited at p. 142 [318 P.2d 825]; cf. Criticism, Gaylord, *Zoning: Variances, Exceptions and Conditional Use Permits in California* (1958) 5 U.C.L.A. L.Rev. 179, at pp. 188-189.)

The precedent of the Board's ruling in this case can at most affect two lots, namely, the subject property and the other lot which remains unimproved in the 100-foot strip. It is possible to deftly dissect the factors that may be said to create the characteristics or conditions attributable to a given piece of property and in the disjunctive find that no one of them will justify a variance. The true test should be an assay of the conglomerate characteristics and conditions in the conjunctive.

Finally, it should be noted that to find no abuse of administrative discretion in the granting of the variance is not to say that it would have been an abuse of administrative discretion for the Board to deny the variance on the same facts. The granting or denying of a variance is generally a matter of grace. In the instant case the net result of the Board's action is to rule that it is proper under the circumstances to permit the same use to be made of the property in 1965 as the legislative body acknowledged would have been proper during the period from 1948 through 1962. The controls imposed by the 1960 ordinance are not eroded to any greater extent.

I would reverse the judgment with instructions to dismiss the petition for a writ of mandate.

Appellants' petition for a hearing by the Supreme Court was denied November 16, 1966.