[S. F. No. 22492.   In Bank.   May 26, 1967.]

BROADWAY, LAGUNA, VALLEJO ASSOCIATION et al., Plaintiffs and Appellants, v. BOARD OF PERMIT APPEALS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents; PERRY LIEBMAN, Real Party in Interest and Respondent.

Caspar W. Weinberger, M. Laurence Popofsky and Heller, Ehrman, White & McAuliffe for Plaintiffs and Appellants.

No appearance for Defendants and Respondents.

Feldman, Waldman & Kline, Jesse Feldman and Richard B. Morris for Real Party in Interest and Respondent.

Martin & Flandricks and Charles R. Martin as Amici Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

TOBRINER, J.—We must decide whether the San Francisco Board of Permit Appeals exceeded the scope of its authority in granting a variance under the circumstances of this case. That variance rested upon the alleged attractiveness of the proposed building, coupled with the belated discovery of subsoil conditions requiring a more costly foundation than anticipated. We conclude that the approval of a variance on such a basis would undermine the foundation of a comprehensive zoning law.

The controversy before us arose in 1963, when a developer (the real party in interest) contacted the Zoning Division of the Department of City Planning concerning a proposal to construct an 11-story, 53-unit apartment building on R-4 property located at 2030 Vallejo Street in San Francisco. The zoning division advised the developer that the proposed structure would contravene the floor area ratio regulations, which comprise the primary bulk and density control mechanism of the City Planning Code.[1] The developer nonetheless refused to modify his plans before applying for a building permit in June 1964; in July the zoning division disapproved the developer's application.

Confronted with this obstacle to the execution of his project unless he obtained a variance, the developer undertook a study of subsoil conditions on his Vallejo Street property. Although he commenced the study several months after informing the Department of City Planning that the proposed structure was already designed, the developer, and ultimately the Board of Permit Appeals, relied exclusively upon this study to support the assertion that "unusual subsoil condi-

---

[1] The developer's structure contains 80,293 square feet of floor space on a lot containing 14,575 square feet. As the developer concedes in his brief, the resulting ratio of 5.51 square feet of floor area to each square foot of lot area exceeds by approximately 15 percent the maximum authorized ratio of 4.8 to 1.0 in an R-4 zone. (City Planning Code, § 122; Zoning Bull. 63.2.)

tions'' required a variance from the floor area ratio regulations.

After completing his subsoil investigation, the developer applied for a floor area variance in August 1964. He urged that the ''unusual conditions'' disclosed by his study would cause unnecessary hardship if the planning code were strictly enforced. He argued further that a variance from the requirements of a ''minor'' code provision seemed appropriate since his building would possess ''attractive features'' above and beyond those required by other code provisions.

The variance requested by the developer, however, did *not* involve a relatively unimportant code provision. On the contrary, the consensus among zoning authorities is that, in terms of controlling population density and structural congestion, the technique of restricting the ratio of a building's rentable floor space to the size of the lot on which it is constructed possesses numerous advantages, both theoretical and practical, shared by no other method of controlling building bulk or density.[2] The developer in the present case thus sought more than relief from a purely technical requirement of an insignificant ordinance; he requested instead a variance from a regulation which has become a cornerstone of contemporary building codes.

To protect such crucial provisions from circumvention, the City Planning Code prohibits the granting of a variance unless the appropriate persons, beginning with the zoning administrator, have first determined that five specified conditions have been met.[3] Having concluded that the developer's

---

[2]See, e.g., Toll, *Zoning for Amenities* (1955) 20 Law & Contemp. Prob. 266, 272-275; Comment, *Building Size, Shape, and Placement Regulations: Bulk Control Zoning Reexamined* (1951) 60 Yale L.J. 506, 514-519. (See also fn. 10, *infra*.)

[3]Section 302(d) of the City Planning Code provides as follows: ''The Zoning Administrator shall grant the requested variance in whole or in part if, from the facts presented in connection with the application, or at the public hearing, or determined by investigation, it appears and the Zoning Administrator specifies in his findings the facts which establish: (1) that there are exceptional or extraordinary circumstances or conditions applying to the property involved, or to the intended use of the property, that do not apply generally to other property or uses in the same class of district; (2) that owing to such exceptional or extraordinary circumstances the literal enforcement of specified provisions of the Code would result in practical difficulty or unnecessary hardship; (3) that the variance is necessary for the preservation of a substantial property right of the petitioner possessed by other property in the same class of district; (4) that the granting of the variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity; and (5) that the granting of such variance will be

application complied with *none* of those conditions, the zoning administrator denied the application in October 1964.

Recognizing the need to accord appropriate weight to the expert administrator's ruling, the draftsmen of the City Planning Code provided that his determination could be overcome only by relevant and specific findings by the Board of Permit Appeals.[4] In reversing the zoning administrator's decision in January 1965, the board purported to comply with the planning code by setting forth its findings with respect to all five code conditions. Acting under the mistaken belief that the board's ultimate conclusion was thereby insulated from judicial review, the trial court deemed itself powerless to grant a writ of mandate to compel the board to set aside its variance order. The petitioner, an association of interested property owners, then instituted this appeal.

■ Although the San Francisco Board of Permit Appeals possesses broadly discretionary power in passing upon permit and licensing matters, it plays a more narrowly confined role in the variance area. (See *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) *ante*, pp. 34, 38 & fn. 8 [56 Cal.Rptr. 672, 423 P.2d 824].) Before granting a variance despite the zoning administrator's denial, the board must specify which aspects of the administrator's ruling it deems erroneous and must set forth in its findings "the facts relied upon in making [its] determination." (City Planning Code, § 303(d).) (See *Cow Hollow Improvement Club* v. *Board of Permit Appeals* (1966) 245 Cal.App.2d 160, 170, 171 (hg. den.) [53 Cal.Rptr. 610].)

This requirement for specific findings differentiates the present case from *Siller* v. *Board of Supervisors* (1962) 58 Cal.2d 479 [25 Cal.Rptr. 73, 375 P.2d 41], relied upon in the amicus curiae brief filed in support of respondents. That brief

in harmony with the general purpose and intent of this Code and will not adversely affect the Master Plan.''

[4]Section 303(d) provides that, upon the hearing of an appeal from a decision of the zoning administrator, the San Francisco Board of Permit Appeals ''may approve, disapprove, or modify the ruling, decision or determination appealed from or, in lieu thereof, make such other additional determination as it shall deem proper in the premises, subject to the same limitations as are placed upon the Zoning Administrator . . . . If the decision of the . . . board . . . differs from that of the Zoning Administrator, it shall, in its decision, specify wherein there was error in the interpretation of the provisions of this Code. or abuse of discretion on the part of the Administrator, and shall specify in its findings the facts relied upon in making such determination. . . .''

cites *Siller* for the proposition that a zoning board's action in granting a variance must be sustained in the absence of a clear and convincing showing of arbitrariness or caprice. Neither in *Siller,* nor in any other decision of similar import (see, e.g., *Flagstad* v. *City of San Mateo* (1957) 156 Cal.App. 2d 138 [318 P.2d 825]; *Bradbeer* v. *England* (1951) 104 Cal.App.2d 704 [232 P.2d 308]), did the governing provisions require the administrative board to specify its subsidiary findings and its ultimate conclusions.

The presumption that an agency's rulings rest upon the necessary findings and that such findings are supported by substantial evidence (see *Siller* v. *Board of Supervisors, supra,* 58 Cal.2d at p. 484; *City & County of San Francisco* v. *Superior Court* (1959) 53 Cal.2d 236, 251 [1 Cal.Rptr. 158, 347 P.2d 294]), does not apply to agencies which must expressly state their findings and must set forth the relevant supportive facts. (Cf. *California Motor Transport Co.* v *Public Utilities Com.* (1963) 59 Cal.2d 270, 273-275 [28 Cal. Rptr. 868, 379 P.2d 324].) In variance cases, the San Francisco Board of Permit Appeals is such an agency.

In a mandate proceeding to review the granting of a variance by that board, the variance order may be sustained only if the board's findings suffice to establish compliance with all of the statutory criteria and are supported by substantial evidence in the record. (See *Cow Hollow Improvement Club* v. *Board of Permit Appeals, supra,* 245 Cal.App. 2d at p. 171; see generally Jaffe, Judicial Control of Administrative Action (1965) 181-182, 190, 320, 575-586, 600-604, 607, 622.)

The basic difficulty with the board's findings in the instant case is not that they lack evidentiary support but rather that they lack legal relevance; even if they are assumed to be correct, those findings simply do not meet the requirements of the planning code.

Viewed in the light most favorable to the board and to the developer, the evidence disclosed by the record before us supports the following findings of fact: (1) After the developer had been told that the proposed building would violate the floor area ratio regulations he undertook a study of his property which revealed that unusual subsoil conditions at that location would increase foundation costs for any structure similar to the one he proposed; (2) such increased costs would render the foundation of the proposed building from

two and one-half to three times as expensive as the developer had anticipated; (3) because of this unexpectedly high fixed cost, the reduction of rentable floor space in this or any similar building to a level consistent with the floor area ratio regulations would prevent the developer from realizing as high a rate of return as he had hoped to obtain from his investment; and (4) the proposed building, apart from its excessive floor area, would conform to limitations more exacting than those imposed by the planning code with respect to height, lot coverage, number of dwelling units, uncovered areas, and parking facilities. Accepting thse findings as true, we have concluded that they fail as a matter of law to satisfy the statutory criteria.[5]

### 1. *Exceptional Circumstances*

The first criterion which a variance application must meet is that there be "exceptional or extraordinary circumstances or conditions applying to the property involved, or to the intended use of the property, that do not apply generally to other property or uses in the same class of district." (City Planning Code, § 302(d).) The board purported to find two such "exceptional circumstances" here: (a) the unusual subsoil condition "applying to the property involved"; and (b) the attractive architectural features "applying to . . . the intended use of the property." Neither of these circumstances, however, satisfies the code criterion.

#### a. *Unusual Subsoil Condition*

We turn first to the subsoil condition belatedly discovered by the developer. On the evidence before it, the board could make no finding, nor did it attempt to make one, linking the subsoil condition to the asserted need for a floor area variance. Unlike cases in which topographical conditions prove to be physically incompatible with attempted adherence to a zoning provision,[6] the case before us presents no logical relationship between the condition identified and the variance requested.

Admittedly, the soil conditions beneath the developer's property restrict its income potential; but the mere fact that a floor area variance would enable the developer to increase the

---

[5]Since we conclude that the first three criteria have not been met, we do not pause to consider whether the last two have been satisfied. (See fn. 9, *infra*.)

[6]See, e.g., *Rodenstein* v. *Board of Appeal of Boston* (1958) 337 Mass. 333 [149 N.E.2d 382]; cf. *Wheeler* v. *Gregg* (1949) 90 Cal.App.2d 348 [203 P.2d 37].

rate of return upon his invested capital can hardly transform the developer's subsoil problem into the sort of "exceptional circumstance" contemplated by the code. In a word, "profit motive is not an adequate ground for a variance." (*Beirn* v. *Morris* (1954) 14 N.J. 529, 534-535 [103 A.2d 361]; see also 1 Metzenbaum, Law of Zoning (2d ed. 1955) 769, 795-796; *id.*, Cumulative Supplement (1967) 94, 102; 8 McQuillin, Municipal Corporations, Zoning (3d ed. 1965 rev. vol.) § 25.168, pp. 550-556, and cases there collected; Gaylord, *Zoning: Variances, Exceptions and Conditional Use Permits in California* (1958) 5 U.C.L.A. L.Rev. 179, 191 fn. 81; Comment (1965) 12 U.C.L.A. L.Rev. 937, 942-943.)

We recognize that virtually *any* circumstance which would lead a commercial real estate developer to seek a variance may ultimately be translated into economic terms: the developer attempts to obtain relief from a particular zoning provision in order to augment the earning power or the market value of his property. We must be careful to distinguish, however, between those circumstances which prevent a builder from profitably developing a lot within the strictures of the planning code and those conditions which simply render a complying structure *less profitable than anticipated.* If conditions which merely reduce profit margin were deemed sufficiently "exceptional" to warrant relief from the zoning laws, then all but the least imaginative developers could obtain a variety of variances, and the "public interest in the enforcement of a comprehensive zoning plan" (*County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 690 [234 P.2d 972]) would inevitably yield to the private interest in the maximization of profits.

Keeping in mind this fundamental difference between circumstances which prevent a variance applicant from economically developing his property and those which simply reduce his expected earnings, we note that in the present case the board determined only that the "unusual subsoil condition" would increase the cost of the proposed building or of any similar high-rise structure. The board did not determine, however, that the subsoil condition in question would similarly increase the cost of a differently designed building.

Moreover, even if we were to assume, as did the board, that the developer could properly insist upon constructing an apartment building similar to the one he originally proposed, we would still confront a fatally defective record: The board

made no finding in this case that the developer could not earn a *reasonable return* upon his investment after modifying his building to the extent necessary to comply with the floor area regulations, nor would the evidence before the board have supported any such conclusion. (Contrast *Wilcox* v. *Zoning Board of Appeals* (1966) 17 N.Y.2d 249, 255 [217 N.E.2d 633].)

In this connection, we note that in July 1965 the petitioners sought a writ of supersedeas to halt construction of the building pending appeal. The court denied the writ after the developer filed under penalty of perjury a declaration stating that if he were permitted to proceed with construction he would thereafter modify the building "by removing the top floor and two ground level apartments, even after construction, to meet floor area ratio requirements of the City Planning Code if [he] should lose the appeal." Thus the developer assured the court that he would make the required modifications if the variance were later held improper. Having implied that he could proceed economically with his project even after altering it to comply with the governing floor area regulations, the developer can hardly claim now that his apartment building will yield an unreasonably low profit unless he is permitted to spread his foundation costs over a rentable floor area beyond that permitted by the code. At most, the developer may urge a reduction in expected revenue; as we have explained, however, such a claim does not rise to the "exceptional" level demanded by the code.

### b. *Attractive Architectural Features*

■■ Nor do the various architectural limitations incorporated in the developer's proposed structure constitute "extraordinary . . . conditions applying to . . . the intended *use* of the property" (italics added) within the meaning of the first variance criterion.

First, the concept of "intended use of the property" does not encompass the contemplated *design* of a building to be constructed on that property but refers only to the *activity* which is to be conducted there.[7] Second, an "intended use"

---

[7] A broader construction of "intended use" might bring the code provision into conflict with state law, since Government Code section 65906 authorizes variances "only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification." (See Comment (1962) 50 Cal.L.Rev. 101, 104, 110 & fn. 61.)

does not constitute an "exceptional circumstance" unless it does not "apply generally to other . . . uses in the same class of district." In this regard, the board found only that the developer proposed "to build according to development standards which are more restrictive . . . than are the provisions of the Code themselves." The board then drew the conclusion that "Therefore, [the developer's] intended use of the property is unique and constitutes an exceptional circumstance." That conclusion was of course a non sequitur. The board made no finding, nor could it have done so on the evidence before it,[8] that *other* buildings in the same zone were not *likewise* built "according to development standards . . . more restrictive . . . than . . . the provisions of the Code themselves."

### 2. *Unnecessary Hardship*

Even if the circumstances identified by the board could qualify under the first criterion, however, the variance should still have been denied since the developer did not show that, as a result of such circumstances, "literal enforcement of [the floor area ratio regulations] would result in practical difficulty or unnecessary hardship." (City Planning Code, § 302(d).) The board found: (a) that, since the building would benefit the community, enforcement of the code would work a hardship upon the surrounding neighborhood; (b) that the developer's adoption of "superior to code" building standards would impose a hardship upon him if the variance were denied; and (c) that "the subsoil condition obviously constitutes a practical difficulty for development."

#### a. *Benefit to the Community*

With regard to the community benefit, the board's finding was neither relevant as a matter of law nor supportable as a matter of fact. Although impact upon the surrounding neighborhood is an important factor in the variance formula, the planning code specifically provides for its consideration under the fourth and fifth criteria.[9] In requiring a showing that literal enforcement would cause hardship, the second criterion

---

[8]The zoning administrator supplied the Board of Permit Appeals with evidence that most buildings in San Francisco, as in other cities, are designed well above planning code minimums.

[9]See footnote 3, *supra*. Indeed, in determining that the fourth and fifth criteria were met, the board expressly found that the granting of the variance would neither injure the community nor conflict with the "master plan" since the proposed building would in various ways "improve all the property in the vicinity" and "protect and enhance the character and stability of this prime residential area." We intimate no

looks only to burdens upon the variance applicant. (See *Tustin Heights Assn.* v. *Board of Supervisors* (1959) 170 Cal. App.2d 619, 627 [339 P.2d 914] ; Gaylord, *op. cit. supra,* 5 U.C.L.A.L.Rev. 179, 188-189.)

Even if it had been legally relevant, however, the board's determination that the community would suffer if the floor area regulations were literally enforced would find no support whatever in the evidence. Accepting as true the board's finding that the ''attractive features'' of the developer's building would benefit the neighborhood, it does not follow that the community would sacrifice such benefits if the code were strictly enforced. Nothing in the record suggests that if his variance application should be denied the developer would forego his project or eliminate any of its beneficial features; indeed, the developer has indicated the contrary under penalty of perjury. Although a denial of a variance would cut into the developer's profit margin, the community derives benefit not from his financial gain but from his conforming building.

### b. *Superior Building Standards*

■ Turning to the board's inclusion of the developer's adoption of superior building standards as an element of hardship upon the developer, we need only note that such self-imposed burdens cannot legally justify the granting of a variance. (*City of San Marino* v. *Roman Catholic Archbishop* (1960) 180 Cal.App.2d 657, 673 [4 Cal.Rptr. 547] ; *Minney* v. *City of Azusa* (1958) 164 Cal.App.2d 12, 31-33 [330 P.2d 255], app. dism. (1959) 359 U.S. 436 [3 L.Ed.2d 932, 79 S.Ct. 941] ; cf. *Caccia* v. *Zoning Board of Review* (1955) 83 R.I. 146 [113 A.2d 870, 872].)

### c. *Practical Difficulty*

All that remains of the board's findings with regard to hardship is its observation that ''the subsoil condition obviously constitutes a practical difficulty for development.'' But the only such ''difficulty'' supportable on this record must stem from the developer's claim of increased foundation cost. In this connection, the board simply concluded that *any* economic

view on the extent to which the record supports these conclusions (see fn. 5, *supra*) ; we note the board's findings only to stress the fact that, in weighing the building's impact upon the community under the second criterion, the board sought to count the same factors twice. If its approach were permissible, the second criterion would ordinarily prove superfluous, since any variance application meeting the fourth and fifth would automatically meet the second. We are unwilling to eradicate an apparently significant portion of the planning code by accepting the board's argument.

sacrifice flowing from enforcement of the floor area regulations should be deemed "unnecessary" in this case because the proposed building would more than comply with all *other* requirements pertinent to bulk and dimension. In reaching this conclusion, the board asserted that the floor area regulations merely duplicate those governing such factors as height, lot coverage, number of units, and open space. Apart from its shallowness,[10] the board's approach rests upon an impermissible assumption: that the draftsmen engaged in an idle act when they added the floor area ratio regulations as independent requirements of the planning code.

The board's characterization of any resulting difficulty or hardship as *automatically* "unnecessary" in this case must stand or fall with the broad notion that a variance applicant may earn immunity from one code provision merely by over-compliance with others. Since few buildings are designed at planning code minimums,[11] variance applications based upon this open-ended theory would soon become commonplace. The board would then be empowered to decide which code provisions to enforce in any given case; that power does not properly repose in any administrative tribunal.[12]

---

[10]Although the board referred to the floor area ratio regulations as "superfluous" and "hypertechnical," zoning authorities consider these regulations uniquely valuable. (See fn. 2, *supra*.) To suggest but one example of their utility, a builder who has complied with the applicable height limits, as has the developer in this case, might still evade controls on population and congestion by leaving little space between floors or by devoting relatively little room for storage and lobby areas; the planning code seeks to prevent such evasion by restricting not only the gross dimensions of a building but also the ratio of its inhabitable floor space to the area of the underlying lot.

Moreover, even if the bulk, congestion, and density objectives of floor area regulation appear to be satisfied by a design which limits size and population through self-imposed restraints on such features as height and number of dwelling units, the code's independent limitation upon floor area ratio reflects basic policy decisions which bind administrative agencies and courts alike. It has been noted, for example, that restrictions upon the *number* of dwelling units per unit of land area encourage building for large or affluent families to the exclusion of quarters for individuals, couples, or families with small means. (See, e.g., Citizens' Housing Council, Densities in New York City (1944) 21.) Floor area ratio regulations, on the other hand, are advantageous in that they permit the construction of smaller and less expensive apartment units. (*Id.*, at pp. 21-22.) Similarly, an emphasis upon limiting *height* in order to control bulk encourages the unfortunate use of lower ceilings, whereas stressing the floor area ratio permits architects to set ceilings at optimum heights. (See Comment, *op. cit. supra*, 60 Yale L.J. 506, 519.)

[11]See footnote 8, *supra*.

[12]Discretionary power to disregard a basic planning code regulation whenever the board believes that the objectives of that regulation have

### 3. *Preservation of Parity*

Entirely apart from "exceptional circumstances" and "unnecessary hardship," the planning code requires that a variance be denied unless it is "necessary for the preservation of a substantial property right of the [applicant] possessed by other property in the same class of district." (City Planning Code, § 302(d).) The board's findings in this case completely fail to establish compliance with this "parity" requirement.

In this connection, the board simply said: " [Developer] has a right to develop his property, notwithstanding adverse soil conditions. Because the Board finds that the variance in this case amounts to no more than an immaterial breach of the Code fully compensated by features of the building not demanded by the Code, and because the record shows that without the variance [the developer] cannot economically proceed with this attractive building, the Board finds that the variance is necessary to preserve that basic property right of [the developer]."

These findings, whether or not accurate, simply do not relate to the matter at hand. Neither the "immateriality" of the developer's breach, nor the extent to which self-imposed building features might "compensate" for it, bears upon the parity issue; nor can we attach any significance to the truism that the developer cannot construct this particular building without the variance he seeks.

Under its findings with respect to "exceptional circumstances," however, the board offered one conclusion of conceivable relevance to our present inquiry: "This site is adverse for multi-unit development in comparison with similar hillside building lots in this particular area." If the "adversity" to which the board referred were such that enforcement of the floor area regulations would effectively deprive the developer of the ability to construct a reasonably profitable

---

been fulfilled in a particular building would probably prove impossible to control and might well undermine the entire zoning plan. We recognize that some authorities urge a compensatory application of the zoning laws, but if a "merit" or "bonus" system should be created in order to reflect the interrelationship among the objectives of various code sections, its adoption must await action by the municipal legislature. Only a detailed set of published guidelines can assure, for example, that the appropriate quantity of bonus floor area is assigned to each specific combination of other building features, and that the resulting system is uniformly and even-handedly applied. (See San Francisco Downtown Zoning Study, Final Rpt., December 1966, pp. 21-29.)

multi-unit structure in an area zoned for multi-unit construction, then the requisite disparity of treatment might be established. As we have seen, however, that is not this case. At most, the developer here has suggested that, unless code requirements are relaxed, multi-unit development will prove somewhat less profitable on his lot than on other lots in the same zone. The short answer to the developer's argument is that zoning variances were never meant to insure against financial disappointments.

▮ Although a variance must be denied unless all five of the specified code conditions have been independently fulfilled, the board's findings in the present case fail to establish compliance with the first three of those conditions; the board's decision to grant a variance therefore exceeded its statutory authority.

The variance sought by the developer in this case would confer not parity but privilege; to sanction such special treatment would seriously undermine present efforts to combat urban blight and municipal congestion through comprehensive zoning codes. So selective an application of the provisions of the City Planning Code would destroy the uniformity of the zoning laws which is their essence.

The judgment is reversed and the cause is remanded to the trial court with directions to issue a writ of mandate requiring the board to vacate its order awarding a variance and to affirm the zoning administrator's original decision denying that variance, and with additional directions to the trial court to grant such further relief as is appropriate.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment of the superior court denying a writ of mandate, for the reasons expressed by Mr. Justice Agee in the opinion prepared by him for the Court of Appeal in *Broadway, Laguna, Vallejo Assn.* v. *Board of Permit Appeals* (Cal.App.) 54 Cal.Rptr. 562.

The petition of the real party in interest and respondent for a rehearing was denied June 21, 1967.