[Civ. No. 60601. Second Dist., Div. Five. Aug. 12, 1981.]

FRANK MILLER et al., Plaintiffs and Respondents, v.
BOARD OF SUPERVISORS OF SANTA BARBARA COUNTY,
Defendant and Appellant;
MARRIOTT CORPORATION, Real Party in Interest and Appellant.

540

**COUNSEL**

Kenneth L. Nelson, County Counsel, Robert D. Curiel, Acting County Counsel, and Susan Trescher, Deputy County Counsel, for Defendant and Appellant.

Cavalletto, Webster, Mullen & McCaughey and James W. Brown for Real Party in Interest and Appellant.

Bycel, Gray & Plebuch, Benjamin Bycel and Bruce Wm. Plebuch for Plaintiffs and Respondents.

**OPINION**

**ASHBY, J.**—The trial court granted a peremptory writ of mandate compelling the Board of Supervisors of the County of Santa Barbara to vacate an order granting a zoning variance to real party in interest Marriott Corporation, doing business as Marriott's Santa Barbara Biltmore Hotel (hereinafter the Biltmore or the hotel). The board and the hotel appeal.

In 1930 the county adopted zoning ordinance No. 453. The hotel and its competitor, the Miramar Hotel, are both located in the 6-R-2 zone. Section 9A1(f) of the ordinance states that a cottage-type hotel may be granted a conditional use permit subject to the approval of the board of supervisors, provided that not less than 80 percent of the sleeping accommodations for guests shall be in several detached buildings or cottages with detached garages, none of which shall contain more than 5 sleeping rooms.

The Biltmore was built in 1927, prior to the enactment of the zoning ordinance. It was not originally designed as a cottage-type hotel within the meaning of the ordinance, since as of 1929 only 15.5 percent of its

206 sleeping rooms were in cottages. At present the Biltmore has 176 sleeping rooms, of which 19.9 percent are in cottages. The Miramar, on the other hand, which was also constructed prior to the enactment of the zoning ordinance, was originally designed as a cottage type hotel with 80 percent or more of its accommodations in cottages. Over the years the Miramar has been allowed to grow and to improve its facilities by numerous conditional use permits and variances and now no longer satisfies the cottage zoning requirement. It has 213 sleeping rooms, 73 percent of which are in cottages.

The Biltmore proposes an expansion and renovation of its facilities. The expansion will result in a net increase of 60 rooms, 43 in main buildings and 17 in cottages. The net result of the expansion will be a total of 236 sleeping rooms, with 22 percent in cottages, a slight increase in the percentage of rooms in cottages.

Since the proposed expansion of 43 rooms in main buildings and 17 rooms in cottages does not satisfy the 80 percent cottage zoning requirement, the project requires a zoning variance, as well as a conditional use permit.

At the public hearing on the proposed project, a number of neighborhood residents, including plaintiffs Frank Miller and Sally M. Perry, opposed any expansion of the Biltmore. Opponents charged that since being taken over by the Marriott Corporation, the Biltmore was being transformed from a "resort" hotel to a "convention" hotel, and that this had led to increased problems of noise, traffic, and congestion in the neighborhood of the hotel. The hotel and the proponents of the project argued that the expansion would benefit the community.

The board of supervisors responded to the concerns of both sides by deciding to grant the variance while at the same time imposing severe restrictions in the conditional use permit to reduce traffic, noise, and congestion problems from the expanded activities of the hotel. The board noted that the adverse effects which had developed over the years from intensified use of the hotel and its private club were not in violation of the hotel's existing nonconforming status or of existing conditional use permits, but that the application for a new permit gave the board its first opportunity to control and reduce these adverse effects.[1]

---

[1]Some examples of the strict regulation under the new conditional use permit include: restrictions on the number of rooms devoted to group convention occupancy at

On plaintiffs' petition for a peremptory writ of mandate, the trial court concluded that the variance must be set aside on the ground that the evidence before the board and the findings of the board failed to satisfy the requirement of Government Code section 65906 that there be special circumstances applicable to the property by reason of which the strict application of the zoning ordinance would deprive the hotel of privileges enjoyed by other property in the vicinity under the same zoning classification.[2]

The trial court undoubtedly was heavily influenced by *Hamilton* v. *Board of Supervisors* (1969) 269 Cal.App.2d 64 [75 Cal.Rptr. 106], decided in 1969, which involved a previous application of this same hotel for a zoning variance, and in which the Court of Appeal held that the board's findings were insufficient to support the variance. However, in the instant case a different project is involved, and the findings of the board are considerably more extensive than in *Hamilton*. ■ ■ ■ ■ We conclude that under all the circumstances *Hamilton* is distinguishable and that the variance in this case was supported by adequate findings and evidence.[3]

## DISCUSSION

Government Code section 65906 provides: "Variances from the terms of the zoning ordinances shall be granted only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification. [¶] Any variance granted shall be subject to such conditions as will assure that the adjustment thereby authorized shall not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated."

---

any one time, restrictions on total membership of the private club, restrictions on total attendance at Sunday brunch, restrictions on nighttime use of the tennis courts and club facilities, and a variety of traffic and parking regulations.

[2]The court upheld the granting of the conditional use permit and there is no issue before us concerning the permit.

[3]Where, as here, the trial court does not exercise its independent judgment as to the weight of the evidence, the appellate court is in the same position as the trial court to determine whether as a matter of law the board's findings are sufficient and whether substantial evidence supports those findings. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 510 & fn. 1, 517-519 & fn. 19 [113 Cal.Rptr. 836, 522 P.2d 12].)

██ Thus the code section has three elements: (1) there must be special circumstances applicable to the property; (2) by reason of which the strict application of the zoning ordinance would deprive such property of privileges enjoyed by other property in the vicinity under identical zoning classification; and (3) any variance granted shall be subject to such conditions as will assure that the adjustment is not a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which the property is located.

Among the findings by the board of special circumstances in this case, we find the following especially significant. "10. Special circumstances apply to the Biltmore which do not apply to The Miramar Hotel (herein called 'Miramar') and the San Ysidro Guest Ranch (herein called 'San Ysidro'). These three hotels are the only hotels under regulation of Ordinance No. 453, and they all now operate under Conditional Use Permits for a cottage-type hotel, they are the only comparable properties in the vicinity, and the Miramar and Biltmore are under identical zoning classification (6-R-2). These special circumstances include (among other matters): [¶] (a) Prior to any zoning affecting the Biltmore property, certain manmade changes were accomplished on the Biltmore parcel which insured that the Biltmore could never comply with the subsequently adopted cottage zoning requirement without substantial demolition of the existing hotel in that: The Biltmore hotel was designed as a hotel with approximately 85% of its units in buildings and 15% of its units in cottages; the Biltmore parcel was graded and laid out for said design; the Biltmore Hotel was constructed thereon in accordance with the design and substantial moneys were expended therefor; the grounds were landscaped and they now consist of expansive lawns, shrubberies, and mature trees. The Miramar and San Ysidro, on the other hand, were designed and constructed, prior to the enactment of any zoning affecting them, with 80% or more of their accommodations in cottages. [¶] (b) The physical characteristics of the existing Biltmore buildings and grounds constitute an aesthetic, architectural, and historic landmark which is unique, not only among the three hotels here in question, but in the United States, in that the Biltmore's main building is one of the finest examples of Spanish Colonial Revival Architecture in southern California. It is surrounded by vast lawns, courtyards and mature, irreplaceable landscaping. This architectural and historical masterpiece should be preserved and should not be altered by addition of the number of cottage units required to bring the Biltmore's proposed renovation and expansion into conformity with the

cottage zoning requirement. [¶] (c) The Biltmore's main building is located on and fronts on Channel Drive, one of Southern California's most scenic drives, precluding use of its broad lawns and extensive landscaping for additional sleeping rooms in cottages without having a detrimental effect upon the character and beauty of Channel Drive. The Miramar Hotel by contrast fronts on a freeway frontage road and is between the frontage road and the ocean, permitting use of the frontage area without aesthetic detriment, while the Biltmore is separated from the ocean by Channel Drive. [¶] (d) Strict adherence to the requirements of Ordinance No. 453 with regard to the cottage zoning requirement would destroy the aesthetic, architectural, and historic character and integrity of the Biltmore by requiring covering the property with numerous additional cottages which would detract from the existing features of the Biltmore while the proposed project would add only one building and would preserve the existing features of the Biltmore."

In comparing this property to the Miramar, the only other hotel in the identical zoning classification, the board also found: "13. The Miramar has approximately 13.87 acres in its entire site; the Biltmore has 20.539 acres in its entire site. The Miramar has approval for 213 sleeping rooms; the Biltmore (upon completion of the 60 room addition) will have 236 rooms. The Miramar has a density of 15.35 sleeping rooms per acre; the Biltmore (upon completion of the 60 room addition) will have 11.49 sleeping rooms per acre. [¶] 14. The strict application of the cottage zoning requirement will deprive the Biltmore of privileges enjoyed by the Miramar in that (among other matters): [¶] (a) The neighboring and identically zoned Miramar has been granted the privilege to grow and improve its guests facilities by numerous Conditional Use Permits and Variances whereby the Miramar first became non-conforming to the cottage zoning requirement in 1954 when only 63% of its units were in cottages and in five subsequent expansions the Miramar has generally trended toward returning to compliance with the cottage zoning requirement although it presently does not comply with the cottage zoning requirement of Ordinance No. 453, inasmuch as only 73% of its units are in cottages of five or less sleeping rooms. [¶] (b) The Miramar presently has a density of 15.35 sleeping rooms per acre. The Biltmore at present has a density of only 8.57 sleeping rooms per acre. After the 60 room addition is completed the Biltmore will have a density of only 11.49 sleeping rooms per acre. [¶] (c) The Miramar does not have detached garages. [¶] (d) Requiring the Santa Barbara Biltmore

to comply with the cottage zoning requirement in its expansion would require the destruction of the existing hotel's design."

In our opinion these findings were sufficient to show that there were special circumstances applicable to the property, by reason of which strict application of the zoning ordinance would deprive the Biltmore of privileges enjoyed by other property in the zoning classification. The Biltmore was not designed as a cottage hotel. The fact that the hotel grounds had been landscaped in such a way that its now expansive lawns, shrubberies, and mature trees would be detrimentally affected by requiring all expansion to be in compliance with the cottage zoning requirement was a special circumstance of "size, shape, topography, location or surroundings" which the board could properly consider. (Gov. Code, § 65906; *Allen* v. *Humboldt County Bd. of Suprs.* (1966) 241 Cal.App.2d 158, 159, 162 [50 Cal.Rptr. 444] [grading altered contour of land before zoning ordinance passed]; *Zakessian* v. *City of Sausalito* (1972) 28 Cal.App.3d 794, 797, 800 [105 Cal.Rptr. 105] [portion of existing building would have to be demolished to provide access to comply with offstreet parking requirement]; see also 3 Anderson, American Law of Zoning (2d ed. 1977) § 18.35, p. 232.)

In *Hamilton* v. *Board of Supervisors, supra*, 269 Cal.App.2d 64, the Biltmore in 1966 sought and was granted a variance to construct an 88-foot addition to the main hotel building. (*Id.*, at p. 65.) The board in that case made several findings similar in many respects to the findings in the instant matter.[4]

---

[4]In *Hamilton*, the board made findings, among others, that: "'4. The Biltmore Hotel gardens, grounds and open spaces constitute a major contribution to the beauty of Channel Drive upon which the Biltmore faces. Channel Drive is one of great scenic beauty which attracts many tourists. Tourism is the major economic welfare of the community. Channel Drive does not run past, into or through the Miramar Hotel. The Biltmore Hotel property is the only 6-R-2 property fronting on Channel Drive. All other properties are zoned 20-R-1.

"'5. To add a number of cottages to the Biltmore to obtain a density closer to that enjoyed by the Miramar Hotel would create a tract-like development and would have a detrimental effect upon the character and beauty of Channel Drive.

"'. . . . . . . . . . . . . .

"'12. The Biltmore is an undoubted asset to the community. In light of the circumstances applicable to the Biltmore, to freeze or restrict its expansion to more little cottages might be advantageous to others but it would cause a special deprivation to the Biltmore, would ultimately be to the detriment of the area, would require otherwise avoidable and unnecessary demolishing of valuable grounds and open spaces, would promote inefficiency and economic waste in the proper utilization of this unique property and would work unnecessary destruction of scenic values.'" (269 Cal.App.2d at pp. 68, 69.)

The Court of Appeal held, "Clearly, none of these circumstances, nor all of them taken together, meet the legal requirement. They incorporate the same reliance on a 'profit motive,' 'attractive architectural features,' 'benefit to the community' and 'practical difficulty' that were urged on the Supreme Court in *Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767, 773 (59 Cal.Rptr. 146, 427 P.2d 810) and there expressly held to 'lack legal relevance.'" (269 Cal.App.2d at pp. 69-70; fn. omitted.)

The instant case involves a different project, changed circumstances and a greatly expanded set of findings. (See *Steiger* v. *Board of Supervisors* (1956) 143 Cal.App.2d 352, 358 [300 P.2d 210].) The primary defect of the board's findings in *Hamilton* was that they failed to relate the special circumstances of the Biltmore property to the circumstances of other properties in the zone. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 520-521 [citing *Hamilton*]; *Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals,* 66 Cal.2d at p. 777 [cited in *Hamilton*].)[5] The findings in *Hamilton* hardly mentioned the Miramar.

Here, on the other hand, there are extensive findings relating the special circumstances of the Biltmore to the privileges enjoyed by the Miramar. The Biltmore was not originally designed as a cottage hotel and essentially it cannot expand within the provisions of the zoning ordinance without damaging the scenic beauty of its lushly landscaped grounds. It is set on a scenic drive by the ocean. The Miramar, on the other hand, was originally designed as a cottage hotel. It is set near a freeway and can expand its cottages "without aesthetic detriment." Over the years, it has been permitted to expand to the point that it has more rooms than the present Biltmore and a much higher density of rooms per acre. ■ Although the fact that another owner has been granted a variance is not by itself a special circumstance which justifies granting a similar variance, it is relevant in assessing the "privileges enjoyed by other property," the second element required by Government Code section 65906. (See *Minney* v. *City of Azusa* (1958) 164 Cal.

[5]The *Broadway* case does not stand for the proposition that the board cannot consider the architectural attractiveness or scenic beauty of existing improvements which would be destroyed by full compliance with the zoning ordinance. In *Broadway* a developer sought a variance for a proposed apartment building from zoning rules concerning floor area ratio. He argued that the fact that he proposed other attractive architectural features beyond minimum code requirements was a ground for granting the variance. The court rejected this because there was no finding or evidence that other buildings in the same zone did not likewise contain such features. (66 Cal.2d at p. 777.)

App.2d 12, 32-33 [330 P.2d 255].) We cannot say as a matter of law that the board was unreasonable in concluding that to limit all further development of the Biltmore to cottages, which would destroy the property's scenic beauty, would deny the Biltmore, by reason of its special topographical and other circumstances, privileges enjoyed by the only other comparable property in the zone.

The third requirement of Government Code section 65906 is complementary to the second. If a variance is granted it must be on conditions which give the applicant substantial parity with other owners in the zone rather than a special privilege better than that enjoyed by its neighbors. (*Hamilton* v. *Board of Supervisors, supra*, 269 Cal.App.2d at p. 66.) Here the board found that no special privilege would be created because the Biltmore's room density per acre would still be less than that of the Miramar. Furthermore, the new size of the Biltmore will be roughly comparable to the Miramar, and the conditional use permit imposes conditions on operations which are at least as onerous as the conditions applying to the Miramar. We find no merit to the argument that the variance gave the Biltmore a special privilege within the meaning of Government Code section 65906.

We conclude that the findings of the board were sufficient to support granting the variance and that the evidence supports the findings.[6]

The judgment granting a peremptory writ of mandate to set aside the board's order granting a variance is reversed.

Stephens, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied September 11, 1981, and respondents' petition for a hearing by the Supreme Court was denied November 12, 1981. Kaus, J., did not participate therein.

---

[6]Although plaintiffs contend that the evidence is insufficient to support the findings, their argument is but a restatement of their contentions that the history of the hotels, the damage to the scenic beauty of the Biltmore which would result from strict compliance with the ordinance, and the privileges granted the Miramar are irrelevant to the granting of the variance. Based upon our conclusion that the findings were relevant and sufficient, there is no substantial question that the evidence supports the findings.