Filed 2/19/14; pub. order 3/14/14 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| STEPHEN ESKELAND et al., | D061370 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00083840-CU-WM-CTL) |
| CITY OF DEL MAR et al., | |
| Defendants and Respondents; | |
| JON SCURLOCK, Individually, and as Trustee etc., | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey B. Barton, Judge. Affirmed.


Law Office of Todd T. Cardiff, Todd T. Cardiff; Niddrie Fish & Addams and David A. Niddrie for Plaintiffs and Appellants.

Stutz, Artiano, Shinoff & Holtz, Leslie E. Devaney, William C. Pate, R. Jacob Gould and Paul V. Carelli IV, for Defendants and Respondents.

Sandler, Lasry, Laube, Byer & Valdez, Edward I. Silverman; Carlin Law Group and Kevin R. Carlin for Real Party in Interest and Respondent.

Stephen and Nahida "Lucy" Eskeland (the Eskelands) appeal from the trial court's denial of the petition for writ of administrative mandamus they filed against the City of Del Mar (the City) and real party in interest Jon Scurlock. The Eskelands challenge the City's decision to grant a variance to Scurlock allowing him to build a house that does not comply with the 20-foot front yard setback requirement in the City's municipal code. We conclude that the Eskelands' arguments are without merit, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Scurlock owns a steep hillside lot in the City at 2026 Seaview Avenue on which sits a two-story house that was built several decades ago. Seaview Avenue runs along the eastern side of the property. The house sits on a level building pad near the southeastern corner of the property. To the west of the building pad, the elevation of the lot slopes approximately 50 feet down the hill, at a grade that exceeds 25 percent in some places.

The lot is in an area zoned R1-10, which allows for single-family residences and requires that the front of the house be set back 20 feet from the street. (Del Mar Mun.

2

Code, § 30.12.070(C).)[1]  The existing house does not comply with the front yard setback requirement because it is situated only nine to 11 feet from the street.[2]

Scurlock proposes to tear down the existing house and build a new house on the footprint of the old house.  The new house would consist of a 1,664-square-foot upper level, a 1,974-square-foot lower level (inclusive of garage), and a 2,152-square-foot basement.  The building plans also include a deck and a swimming pool to the west of the house.  As it would be constructed on the footprint of the old house, the new house would also be nine to 11 feet from the street and, like the old house, would encroach into the 20-foot front yard setback.[3]

Under the applicable City procedures, Scurlock first filed an application with the City's Design Review Board for its approval of the project.  (See Mun. Code, § 23.08 [setting forth design review requirements].)  After Scurlock revised the project to address certain concerns, the Design Review Board found that the project was consistent with the goals and policies of the City's municipal code and approved Scurlock's development application in June 2010.  As part of the Design Review Board's approval, it considered

---

[1]    All further municipal code references are to the Del Mar Municipal Code.

[2]    The parties all appear to assume for the purposes of discussion that when the house was originally built, it complied with the front yard setback existing at the time, although no document in the record establishes the year the house was built or the applicable zoning requirements at the time.

[3]    As we will explain below (see part II.B, *post*), the parties disagree about whether certain differences between the footprint of the existing house and the proposed new house will cause the new house to expand the encroachment into the front yard setback.

3

whether alternative designs were available that could eliminate the need to encroach into the front yard setback. The Design Review Board concluded that placing the new house on the existing building pad instead of moving it farther to the west would minimize adverse impacts to steep slopes, minimize land disturbance from grading the site, and minimize the bulk and mass of the retaining walls. The Design Review Board determined that with respect to the design issues on which it was focused, the best alternative was to locate the new house on the footprint of the old house. Therefore, it recommended that the Planning Commission approve a variance to the front yard setback. The Design Review Board's approval was appealed to the City Council, which upheld the Design Review Board's decision.

Scurlock then filed an application with the City's Planning Commission for a variance from the front yard setback requirements, which is the application at issue in this appeal.

Each member of the City's Planning Commission personally visited the site, which was followed by a hearing on September 14, 2010. After considering the documents and testimony presented at the hearing, the Planning Commission adopted a resolution conditionally approving the variance from the 20-foot front yard setback. The resolution contains numerous findings in support of the Planning Commission's decision. Principal among those findings was that "[t]here are special circumstances relative to the lot's shape, topography, location, and surroundings, such that strict application of the front yard setback deprives the property owner of privileges enjoyed by other properties in the vicinity." The Planning Commission also stated that "[a]lternative development plans

4

were studied and are limited because of the lot's topography, shape, location, public and private views, vehicular access, and surroundings."

The Eskelands, along with residents of three other homes in the neighborhood, appealed the Planning Commission's approval of the variance to the City Council. Among other things, the appeal argued that "[t]here is no legitimate reason that the project cannot comply with the setback requirements[,]" and that there are "design alternatives that do not require the use of a setback variance."

After each City Council member visited the site, the City Council considered the appeal on October 18, 2010. The City Council declined to set the appeal for a de novo public hearing, and thus the decision of the Planning Commission conditionally approving the variance became the final decision of the City.

The Eskelands filed a petition for writ of administrative mandamus against the City and related entities[4] to obtain an order requiring the City to set aside its approval of the variance. The petition named Scurlock, as an individual and as trustee of his family trust, as the real party in interest.[5] The trial court denied the petition, ruling that substantial evidence supported the City's findings approving a variance to the front yard setback requirements.

---

[4]    Specifically, the Eskelands named as respondents the following related entities: the City, the City Council, and the City's Planning Commission. Of those respondents, only the City filed an answer.

[5]    The petition also identified Lorie A. Scurlock as an individual and trustee of the family trust as a real party in interest, but the parties subsequently stipulated to her dismissal.

The Eskelands appeal from the judgment.

## II

## DISCUSSION

A.    *Standard of Review*

The Eskelands filed this action under Code of Civil Procedure section 1094.5, which authorizes petitions for administrative mandamus to "inquir[e] into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (*Id*., subd. (a).)  "When evaluating the validity of an administrative decision, both the trial court and appellate court perform the same function . . . ."  (*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1182 (*Committee to Save Hollywoodland*).)  "Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal." (*Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 922 (*Stolman*).)

We review the administrative decision to determine whether it was "without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).)  An abuse of discretion is established "if the respondent has not proceeded in the manner required by

6

law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."[6] (Code Civ. Proc., § 1094.5, subd. (b).)

With respect to the City's findings, a court reviewing the grant of a zoning variance "must determine whether substantial evidence supports the findings and whether the findings support the conclusion that all applicable legislative requirements for a variance have been satisfied." (*Topanga*, *supra*, 11 Cal.3d 506 at p. 511, italics omitted.) " 'In determining whether the findings are supported, "[w]e may not isolate only the evidence which supports the administrative finding and disregard other relevant evidence in the record. [Citations.] On the other hand, neither we nor the trial court may disregard or overturn the . . . finding ' "for the reason that it is considered that a contrary finding would have been equally or more reasonable." ' " ' " ' " (*West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1518.) We "must afford a strong presumption of correctness" to administrative findings. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.) "Under the substantial evidence test, the agency's findings are presumed to be supported by the administrative record and the appellant challenging them has the burden to show they are not." (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469.)

---

6      The parties agree that, as fundamental vested rights are not at issue here, this is not the type of administrative mandamus proceeding in which the court must exercise its independent judgment on the evidence. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 510 & fn. 1 (*Topanga*) [a dispute over a zoning variance does not touch upon any fundamental vested right]; *PMI Mortgage Ins. Co. v. City of Pacific Grove* (1981) 128 Cal.App.3d 724, 729 ["Usually, no vested right is affected by either the denial or granting of a variance . . . ."].)

7

With respect to questions of law, "we are not bound by any legal interpretation made by the [City] or the trial court. Instead, we make an independent review of any questions of law necessary to the resolution of this matter on appeal." (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077.) "The rules applying to the construction of statutes apply equally to ordinances . . ." and other laws passed by local governments. (*Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 838.)

B.     *The City Did Not Violate the Municipal Code Provisions Making It Unlawful to Expand a Nonconforming Structure*

We first address a series of related arguments that depend on a single premise. Specifically, the Eskelands contend that the municipal code prohibits the City from approving an application to expand a nonconforming structure if the expansion would increase the degree of the nonconformity. Relying on this premise, the Eskelands contend, among other things, that (1) the City violated its own laws by approving the variance; and (2) the City improperly granted a special privilege to Scurlock by allowing him to expand the degree of nonconformity of a nonconforming structure because that approval was not legally authorized.[7] As we will explain, the premise of the Eskelands' argument is flawed. As long as the requirements for a variance are met, the municipal

_____

[7]     This argument is based on the municipal code provision, which we will discuss more fully in a later discussion, that a variance should be granted only if it "will not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated." (Mun. Code, § 30.78.030, subd. (B).)

8

code does not preclude the City from approving a variance that will expand the degree of nonconformity of a nonconforming structure.

We begin our analysis by focusing on the pertinent provisions of the municipal code. Two separate chapters are relevant: chapter 30.76, titled "Nonconformities"; and chapter 30.78, titled "Variances."

The chapter on nonconformities identifies the concept of a structural nonconformity, which is defined as "a physical aspect of a building, structure or improvement that: [¶] A. Does not conform to the development standards announced in this Chapter to include, without limitations, height, setbacks, lot area, parking, type of building, or coverage of lot by structure; [¶] B. Did comply with the development standards contained in the Zoning Ordinance in effect at the time the building, structure or improvement was constructed or structurally altered and was lawfully constructed; and [¶] C. Has not been terminated in accordance with the provisions of this Chapter." (Mun. Code, § 30.76.030.) It is undisputed that the current house on Scurlock's property includes a structural nonconformity because it does not comply with the current front yard setback requirements but apparently did comply with the applicable requirements at the time it was built.

As the Eskelands emphasize, the municipal code expressly makes it unlawful for a person to expand a structural nonconformity. Specifically, "It is unlawful for any person to enlarge, extend, expand or in any other manner change a . . . structural nonconformity

9

so as to increase its inconsistency with the zoning restrictions of this Chapter."[8]  (Mun.

Code, § 30.76.050.)  The code sets forth the consequences for attempting to expand a

nonconformity:  "If a . . . structural nonconformity is enlarged, extended, expanded or in

any other manner changed to increase its inconsistency with the regulations of this

Chapter, then, in additional to any other consequences imposed by this Code, any

entitlement to thereafter maintain the nonconformity is terminated."  (Mun. Code,

§ 30.76.090, subd. (D).)

The municipal code establishes the conditions under which a person may remodel

a building containing a structural nonconformity and still maintain the nonconformity.  If

the remodeling costs *less* than 50 percent of the building's value, the project may be

approved "so long as the nonconformities are not enlarged, extended or expanded."

(Mun. Code, § 30.76.070, subd. (C).)  In contrast, if the remodeling costs *more* than

50 percent of the value of the building, the owner will not be entitled to maintain the

nonconformity and the project will be approved only if it "complies with all of the

regulations of this [municipal code]."  (Mun. Code, § 30.76.070, subd. (B).)

Here, because Scurlock intends to completely rebuild the house, the provision for

remodels that cost more than 50 percent of the value of the building is applicable.

Therefore, even were Scurlock to propose to follow the exact footprint of the current

---

[8]     As it is not dispositive to our analysis, we need not, and do not, resolve the parties'
debate about whether, in referring to "the zoning restrictions of this Chapter," Municipal
Code section 30.76.050 intends to refer only to the *chapter* entitled "Nonconformities" or
to refer to the entire *title* of the municipal code dealing with zoning.

house and not *expand* the structural nonconformity in the least, he would not be entitled to maintain the structural nonconformity.  Instead, because Scurlock is planning a complete remodel, he must comply with *all* provisions of the current municipal code.

Under the current municipal code, the only way for Scurlock to gain approval of his plan to build a house that is set back less than 20 feet from the road is to satisfy the conditions in the municipal code for obtaining a variance.  As set forth in Municipal Code section 30.78.030, the following standards must be met to obtain a variance:

> "A.     A variance from the terms of the Zoning Ordinance shall be granted only when, because of the special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the Zoning Ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification.
>
> "B.     Any variance granted shall be subject to such conditions as will assure that the adjustment thereby authorized will not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated.
>
> "C.     A variance will not be granted for a parcel of property which authorizes a use or activity which is not otherwise expressly authorized by the zoning regulation governing the parcel of property. . . .
>
> "D.     No variance shall be granted if the inability to enjoy the privilege enjoyed by other property in the vicinity and under identical zoning classification:
>
> > "1.  Could be avoided by an alternative development plan;
> >
> > "2.  Is self-induced as a result of an action taken by the property owner or the owner's predecessor;
> >
> > "3.  Would allow such a degree of variation as to constitute a rezoning or other amendment to the zoning code; or

11

"4.  Would authorize or legalize the maintenance of any private or public nuisance."[9]

Despite the municipal code provisions allowing a person to obtain a variance from the zoning requirements, the Eskelands contend that those provisions are not available to Scurlock because he proposes to *expand* a structural nonconformity.  In support of this argument, the Eskelands rely on Municipal Code section 30.76.050, which as we have noted, states that "[i]t is unlawful for any person to enlarge, extend, expand or in any other manner change a . . . structural nonconformity so as to increase its inconsistency with the zoning restrictions of this Chapter."  (Mun. Code, § 30.76.050.)

Before turning to the legal merits of the Eskelands' argument, we observe that the parties do not agree on whether Scurlock proposes to *expand* a structural nonconformity or merely maintain the existing degree of a structural nonconformity.  As the Eskelands interpret the architectural drawings, the footprint of Scurlock's new house will extend approximately 15 feet further to the north along Seaview Avenue, and therefore the *length*, but not the *depth*, of the encroachment into the front yard setback will expand. Scurlock disagrees, contending that the footprint of the new house would not increase the encroachment into the front yard setback in any direction and that the evidence cited by the Eskelands does not support their position.  The Planning Commission apparently viewed the facts as Scurlock does, finding that the variance would allow an encroachment

---

[9]     Municipal Code section 30.78.030, subdivisions (A) through (C) are based on nearly identical language in Government Code section 65906.  However, no portion of the Government Code contains language equivalent to Municipal Code section 30.78.030, subdivision (D).

into the front yard setback "in the same alignment and the same distance as the setback of the existing residence" and that "[t]here will be no increase in the degree of non-conformity." Our review of the architectural drawings in the record does not conclusively resolve the issue. However, as will become clear from our discussion, it is unnecessary for us to resolve the factual dispute. Even assuming for the sake of discussion that Scurlock proposes to *expand* a structural nonconformity rather than simply maintain it, the Eskelands have not established that the City acted contrary to the municipal code in approving the variance.

The Eskelands' central contention is that when someone seeks to expand a structural nonconformity, Municipal Code section 30.76.050 takes precedence over the provision of the municipal code allowing someone to obtain a *variance* from zoning requirements. They argue that "[t]here is an absolute prohibition on the expansion of nonconformities in any manner." In opposition, both the City and Scurlock contend that the Eskelands misapprehend the law and ignore the difference between the right to continue a nonconformity and the right to apply for a variance from the applicable zoning law. "We defer to [the City's] construction of its own [municipal code]" (*Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880, 891), which " ' "will be accorded great respect by the courts and will be followed if not clearly erroneous." ' " (*Stolman*, *supra*, 114 Cal.App.4th at p. 928.) As we will explain, the City's construction of its municipal code is reasonable, and the Eskelands' view leads to absurd results.

We begin with the fundamental observation that the legal right to continue a structural nonconformity and the legal right to apply for a variance are two completely

13

separate concepts. "[W]hen an owner claims that he has a vested right to an existing nonconforming use[,] he is not required to apply for a variance or use permit . . . ." (*O'Mara v. Council of City of Newark* (1965) 238 Cal.App.2d 836, 841.)[10] Consistent with this distinction, the portions of the municipal code describing an entitlement to continue a structural nonconformity and the right to obtain a variance are set forth in separate titles. Although Municipal Code section 30.76.050 states that "[i]t is unlawful for any person to enlarge, extend, expand or in any other manner change a . . . structural nonconformity so as to increase its inconsistency with the zoning restrictions . . . ," the provision says nothing about prohibiting an application for a *variance* that would increase a structural nonconformity. As the procedure and standards for obtaining a variance are completely separate from the provisions describing the right to continue a structural nonconformity, the most reasonable interpretation of Municipal Code section 30.76.050 is that it does not limit the rights that a person may have under the separate municipal code title pertaining to variances.

---

10    As our Supreme Court has observed, zoning ordinances customarily allow structural nonconformities or nonconforming uses to continue in order to avoid any intrusion on the rights of property owners. "Zoning ordinances and other land-use regulations customarily exempt existing uses to avoid questions as to the constitutionality of their application to those uses. 'The rights of users of property as those rights existed at the time of the adoption of a zoning ordinance are well recognized and have always been protected.' [Citation.] [¶] Accordingly, a provision which exempts existing nonconforming uses 'is ordinarily included in zoning ordinances because of the hardship and doubtful constitutionality of compelling the immediate discontinuance of nonconforming uses.' " (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 552.) In light of this reason for allowing the continuance of structural nonconformities, it makes sense that the City's municipal code entitles a person to continue, but not *expand*, a structural nonconformity.

14

Further, the portion of the municipal code dealing with structural nonconformities makes clear that once a person decides to undertake a complete remodel exceeding 50 percent of the value of the building, the portions of the municipal code entitling a person to continue an existing structural nonconformity are not applicable. Instead, as Municipal Code section 30.76.070, subdivision (B) states, a person undertaking a complete remodel is required to comply with "*all* of the regulations of this Code," which includes the ability to obtain a variance when the applicable requirements are met. (*Id.*, italics added.) Here, as Scurlock proposes to tear down the existing house, Scurlock's project is governed by the provisions of the municipal code as a whole, including its procedures for obtaining a variance.[11]

As the City points out, absurd results would occur if the municipal code were interpreted as the Eskelands suggest. (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 ["Interpretive constructions which . . . lead to . . . absurdity . . . are to be avoided"]; *People v. Coronado* (1995) 12 Cal.4th 145, 151 [statutory

---

[11]  In arguing that the prohibition on expanding a structural nonconformity precludes Scurlock from obtaining a variance that expands the degree of nonconformity, the Eskelands cite *Ideal Boat & Camper Storage v. County of Alameda* (2012) 208 Cal.App.4th 301. However, that case is inapposite. *Ideal Boat* concluded that a property owner was properly denied permission by the county for a variance from the applicable zoning ordinance to expand an already nonconforming use of the property. In that case, a specific voter initiative had been passed stating that " 'no . . . development plan, use permit, *variance* or any other discretionary administrative or quasi-administrative action which is inconsistent with [the restrictive zoning] ordinance may be granted, approved or taken.' " (*Id.* at p. 308, italics added.) No such law exists in this case that expressly precludes the approval of a *variance* from the City's zoning laws. Here, the City could have, but did not, include language in its municipal code prohibiting the issuance of a *variance* to expand a structural nonconformity.

interpretation must "avoid an interpretation that would lead to absurd consequences."].)
Under the Eskelands' interpretation, someone who planned to build a new house on a vacant lot or on a lot containing a structure that was in compliance with existing setback requirements would be able to apply for and obtain a variance from the zoning code *to any degree shown to be necessary* under the applicable standards. In contrast, someone like Scurlock, who bought a lot containing a house with an existing structural nonconformity, would be *severely limited in the degree of the variance* he could obtain even if he otherwise met all the prerequisites for obtaining a variance and showed that it was necessary. That interpretation would, without any reasonable basis, apply different treatment to similarly situated persons with respect to their right to take advantage of the variance procedure, even when a showing of necessity was made, and would accordingly lead to absurd results.

The Eskelands also argue that Municipal Code section 30.76.130 supports their position. Municipal Code section 30.76.130 states in relevant part that, except in certain circumstances not pertinent here, "if a property owner proposes a project that will replace or develop all or a portion of an existing structure which contains several nonconformities, the City may allow the owner to continue certain nonconformities if: [¶] A. The Planning Commission concludes based on specific findings of fact that: [¶] 1. The proposed project will not expand an existing nonconformity; and [¶] 2. There is a public benefit in obtaining Code compliance to be derived from the elimination of one or more of the existing nonconformities that is not outweighed by the public detriment of allowing other, existing nonconformities to continue . . . ."

16

This provision does not apply for several reasons. First, Scurlock's existing house contains only a *single* structural nonconformity. In contrast, Municipal Code section 30.76.130 applies to structures containing *several* nonconformities, allowing the City to retain some nonconformities and abate others. Second, Scurlock did not seek relief under Municipal Code section 30.76.130 to continue a structural nonconformity, and thus it is irrelevant whether Scurlock can claim its benefits. Finally, like the other municipal code provisions on which the Eskelands rely, Municipal Code section 30.76.130 provides no indication of an intention to preclude a person from applying for a variance under a completely separate portion of the municipal code.

In sum, we conclude that the provisions of the municipal code dealing with a person's right to maintain a structural nonconformity have no bearing on whether Scurlock is entitled to apply for and obtain a variance from the City's zoning requirements.[12]

---

[12] Based on their contention that the municipal code prohibits a variance to expand a structural nonconformity, the Eskelands contend that Scurlock was granted a special privilege to *expand* a structural nonconformity, and therefore the City was required to establish that other property owners had also been granted such a privilege. Specifically, the Eskelands contend that "[t]he City's failure to demonstrate that any property owner in the City, let alone in the vicinity, had ever been granted a variance to expand a nonconformity with zoning, demonstrates that such a grant was a special privilege." However, this argument is premised on the assumption that the municipal code prohibits a variance to expand a nonconformity. As we reject that interpretation of the municipal code, we perceive no reason to require the City to make an affirmative showing that other property owners gained approval of variances to expand a structural nonconformity. As we will discuss below, it is sufficient that the City established it granted setback variances to additional property owners in the neighborhood based on the unique topography of their lots, so that Scurlock did not receive the special privilege of a setback variance.

17

C.      *The City's Grant of Variance a Is Supported by Substantial Evidence*

We next consider the Eskelands' contention that insufficient evidence supports the findings that the Planning Commission made in approving the variance. We proceed by separately focusing on each of the particular standards for obtaining a variance under Municipal Code section 30.78.030 that the Eskelands contend are not supported by substantial evidence.

1.      *Special Circumstances Applicable to the Property*

To support a variance, the record must contain substantial evidence that "because of the special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the Zoning Ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification." (Mun. Code, § 30.78.030, subd. (A).) The Eskelands contend that the evidence does not support such a finding.

In its resolution approving the variance for Scurlock's property, the Planning Commission made extensive findings with reference to the standards set forth in Municipal Code section 30.78.030, subdivision (A):

> "There are special circumstances related to the lot's shape, topography, location and surroundings, such that strict application of the front yard setback deprives the property owner of privileges enjoyed by other properties in the vicinity.
>
> "The topography of the site drops significantly, approximately 50-feet from Seaview Avenue to Christy Lane. There is a small building pad toward the upper portion of the site on which an existing two-story residence is situated. The remainder of the slope below the building pad contains slopes in excess of 25%. The property is located such that development would be visible from Camino del Mar and other public and private properties to the

18

west. The proposed residence is located on the southeastern portion of the lot, which preserves a wide scenic view corridor over the remaining northern portion of the lot for the public along Seaview Avenue and other private properties to the east. The Planning Commission also determined that the existing alignment and curvature of Seaview Avenue causes an unusual alignment (a 'bend in') of the front yard setback thereby further restricting the development potential of this lot. The front property line and curvature associated with the right-of-way produces an irregular shape of the lot (and required setbacks) which also support the approval of a front yard setback variance.

"As determined with the Design Review Board at their May and June 2010 meetings, and as confirmed by the Planning Commission at their September 2010 meeting, siting structure or extending the proposed home any farther to the north would result in unreasonable private and public view blockage to the properties to the east as well as privacy concerns for the northerly neighbor. The Planning Commission determined that granting the Variance for the project would achieve the goals and objectives of the Community Plan in protection of public and private scenic views for residential development . . . . Siting the structure farther to the west would result in adverse impacts to steep slopes, loss of open space, additional bulk/mass due to taller retaining walls and more disturbance of existing landform. If the home were to be moved more to the west, the grade change would make the new driveway very steep and dangerous. The Planning Commission also determined that granting the Variance for the project would achieve the goals and objectives of the Community Plan in encouraging development to be sited to preserve steep slopes whenever possible. . . . As a result of the lot's topography shape, location and surroundings, the Planning Commission concludes that the most appropriate area to built a new home is the southeastern portion of the lot generally where the proposed home would be sited.

"Granting the Variance allows a nine (9) to eleven (11) foot encroachment within the required 20-foot front[]yard setback in the same alignment and the same distance as the setback of the existing residence. It allows the property to be developed with a single-family residence with associated amenities that would be similar to other developments within the area and located within the R1-10 Zone, while minimizing adverse view blocking impacts to neighboring properties, the surrounding public rights-of-way, and the site. Additionally, evidence was presented to the Planning Commission that there are many neighboring properties in the R1-10 zone that either have reduced front yard setbacks, or have been granted a front yard setback Variance. To treat this property differently would deprive this

19

property owner of privileges enjoyed by some of the neighbors.  As such, are there special circumstances applicable to the property, including size, shape, topography, location and surroundings, whereby the strict application of the Zoning Ordinance will deprive the property of privileges enjoyed by other properties in the vicinity under identical zoning classification."

The Eskelands' first argument concerning these findings is that insufficient evidence establishes that Scurlock's lot is different from the surrounding lots.  The Eskelands argue that the lot is situated in a hilly area where many properties are faced with the same limitations.

In assessing this argument we follow the rule that "[a] zoning variance . . . must be 'grounded in conditions peculiar to the particular lot as distinguished from other property' in the specific plan area. . . .  Unnecessary hardship therefore occurs where the natural condition or topography of the land places the landowner at a disadvantage vis-à-vis other landowners in the area, such as peculiarities of the size, shape or grade of the parcel." (*Committee to Save Hollywoodland*, *supra*, 161 Cal.App.4th at p. 1183, citations omitted.)  The emphasis is on "disparities between properties, not treatment of the subject property's characteristics in the abstract." (*Topanga*, *supra*, 11 Cal.3d at p. 520.)

Here, substantial evidence supports a finding that the lot contains unique characteristics.  As the Planning Commission described (1) the topography of the site drops approximately 50 feet from east to west, (2) the existing building pad is situated at the upper portion of the site, beyond which the property contains slopes in excess of 25 percent; and (3) Seaview Avenue has a westward curvature in front of the property, producing an irregularly shaped area fronting the street.  The evidence in the record

20

supports a finding that all of these characteristics of Scurlock's property in fact exist, and furthermore that they are not typical of all of the properties in the City that are subject to the 20-foot setback requirement. The record contains several maps showing that the R1-10 zoning area extends over a large part of the City and contains a variety of different lot configurations. Clearly, only a fraction of the lots are perched on the edge of a steep hillside. Scurlock's architect confirmed this fact, stating that "[h]aving a site that slopes 50 feet from front to back is far from typical."

Further, the relatively small area of level building pad on Scurlock's property is not typical, even of the adjacent properties. A letter in the record from Scurlock's architect stated that the lot immediately to the south had a flat building pad that extended a total of 80 to 85 feet from the front property line, while, in contrast, the flat pad on Scurlock's property extends only a total of 35 feet from the front property line. Further, the maps show that the shape of the street in front of Scurlock's lot is unlike most other properties subject to R1-10 zoning because the street curves toward the west and then back toward the east in front of the lot, creating a "C"-shaped street frontage instead of following a straight line.

The Eskelands next contend that even if Scurlock's lot contains certain unique characteristics, substantial evidence does not support a finding that, because of those unique characteristics, "the strict application of the Zoning Ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification." (Mun. Code, § 30.78.030, subd. (A).)

21

Although the Planning Commission could have been more clear about the nature of the privileges that Scurlock is unable to enjoy, a close examination of the Planning Commission's discussion reveals several relevant privileges. As we understand the Planning Commission's comments, it concluded that (1) the "development potential of this lot" was "restrict[ed]" by its unique characteristics; (2) that without a variance the property could not be developed "with a single-family residence with associated amenities that would be similar to other developments within the area"; (3) that without a variance, Scurlock would unreasonably be restricted to building a house that would create "adverse impacts to steep slopes, loss of open space, additional bulk/mass due to taller retaining walls and more disturbance of existing landform"; and (4) without a variance, the driveway would be "very steep and dangerous."

The Eskelands' principal challenge to the these findings is that Scurlock's proposed building design "nullifies the very principals used to justify the variance." Specifically, the Eskelands argue that Scurlock should not have been granted a variance for the purpose of allowing him to unreasonably avoid building on steep slopes, disturbing the existing landform and building bulky retaining walls because the project design does not avoid those problems. As the Eskelands interpret the evidence, the proposed project already undertakes grading of the existing flat building pad to allow for a basement, and the swimming pool will be built on some of the 25 percent slope. The Eskelands argue that "[n]o objectively reasonable person could find that a small building pad constituted special circumstances when the proposed project excavates the existing building pad. No objectively reasonable person could find that the slope precludes building absent the

22

variance when the project, as proposed, will be constructed on the 25% slope."  They also argue more generally that "[i]t is neither technically infeasible, nor unduly burdensome to move the project 10-11 feet westward and further down the slope."[13]

We reject the Eskelands' argument because substantial evidence supports the Planning Commission's finding that if the house were moved further to the west, there would be increased impact to steep slopes, more loss of open space, additional bulk/mass due to taller retaining walls and more disturbance of existing landform.  The evidence also supports a finding that building the project would be more difficult and more costly.

We begin with the obvious fact that if the house were moved to the west, it would move down the hill and consume more of the steep slope.  An architect retained by the Eskelands, Lynn Johnson, submitted written comments to the Planning Commission and the City Council, which attached a drawing of how the house would be situated on the lot if it were moved back to comply with the 20-foot front yard setback.  As that drawing shows, if the house were moved back it would cover more of the steep hillside and would leave less open space.

Johnson opined that "the slope of the lot does not preclude building on it and observing all the required building setbacks," and that "[a] variance for the encroachment of 10' into the required 20' front yard setback should not be necessary in order to develop this property in a manner similar to other properties in the area . . . ."  However, Scurlock

---

13     The Eskelands also contend, based on lines appearing on the architectural drawings, that "95 percent of the slope will be graded and remanufactured."

presented evidence to the contrary. Scurlock's architect stated that "[i]t is surely possible to build on the steep slopes but it is far from the best solution." He stated that "[b]y sliding it further down the hill we're going to have to build . . . more retaining walls and more grading so that does make [the expense] prohibitive." Upon specific questioning, Scurlock's architect confirmed for the Planning Commission that if the house was moved 10 feet to the west, it would be on a very steep part of the slope and more retaining wall would be needed. The City was entitled to credit this evidence, and it is not our role to second guess the City's choice to do so.

The Eskelands also dispute the Planning Commission's finding that the driveway would be steep and dangerous if the house was moved farther to the west. The Eskelands point out that their architect opined that "the driveway can be lengthened in order to minimize the slope" and "can be built in a manner that would not cause it to be excessively steep." However, in contrast to this opinion, a certified planner who submitted a letter to the Planning Board in support of the variance stated that "[s]iting the house further downslope would cause the driveway gradient to exceed the 20% recommended slope." Based on that statement and evidence that the lot becomes steeper toward the west, substantial evidence supports the Planning Commission's finding that moving the house to the west would make the driveway steep and dangerous.[14]

---

14     The Eskelands contend that it is evident from the architectural drawings in the record, from the maps showing the lot's topography, and from basic geometrical principles that moving the house to the west would not create a steep driveway. Respondents disagree. From the parties' argument, it is evident that the issue of whether it is possible to build a safe driveway while moving the house to the west is a factually

In addition to their specific challenges to the sufficiency of the evidence, we also understand the Eskelands to be advancing the position that because it was physically possible for Scurlock to build a house that complied with the front yard setback requirement, Scurlock should have been required to do so, despite the degree of difficulty or expense involved and despite any other negative consequences of such a design.  That is not the law.  For one thing, the increased expense involved in developing a lot that poses topographical challenges is properly considered when deciding whether a variance is warranted.  (*Zakessian v. City of Sausalito* (1972) 28 Cal.App.3d 794, 802 ["It is true that financial hardship alone, at least ordinarily, will not constitute unnecessary hardship. But where the unique condition of one's property causes the financial hardship the rule is otherwise."].)  "It would be a rare case of topographical uniqueness of land that could not be alleviated by *some* amount of financial expenditure[,]" and thus there is no rule requiring a property owner to incur the expense to address the topographical uniqueness rather than obtaining a variance.  (*Ibid.*)  Further, in determining whether Scurlock should be granted a variance because of the unique features of his property, the City may consider — among other things — whether there would be an adverse impact on aesthetic goals such as preserving open spaces and reducing bulk and mass if Scurlock was required to comply with the setback requirement.  (See *Miller v. Board of Supervisors* (1981) 122 Cal.App.3d 539, 545, 548 [approving variance, when local agency found, among other things, that requiring adherence to zoning requirements "would destroy the

disputed issue on which expert opinion is relevant, and the Planning Commission properly considered such evidence in reaching its findings.

aesthetic, architectural, and historic character and integrity" of the existing structure and would "destroy the property's scenic beauty"].)

In sum, we conclude that substantial evidence supports a finding that because of special characteristics applicable to Scurlock's property, Scurlock would be at a disadvantage to other property owners in the R1-10 zone if he was required to strictly comply with the 20-foot front yard setback.

### 2.    *Scurlock Was Not Granted a Special Privilege*

Next, the Eskelands focus on the requirement that "[a]ny variance granted shall be subject to such conditions as will assure that the adjustment thereby authorized will not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated."  (Mun. Code, § 30.78.030, subd. (B).)

The Planning Commission made the following findings on this issue:

"Granting the proposed Variance would not constitute a special privilege. The lot's steeply sloping topography, shape, location, and surroundings significantly limit the lot's buildable area.  These conditions are the cause for, and justification for the Variance.  The proposal is to encroach into a portion of the required front yard setback (the same setback of the existing single-family home to be removed.)  There will be no increase in the degree of non-conformity.

"The existing residence, along with other properties along both the west and east side of Seaview Avenue with similar lot topography characteristics and located in the R1-10 Zone, currently encroach into the setbacks, or have been granted Variances for various setback encroachments.  Evidence was presented to the Planning Commission of many homes within the immediate vicinity in the R1-10 Zone that have Variances (including front yard, side yard and rear yard encroachments).  There are three (3) properties within six-hundred (600) feet that have other yard setback Variances.  As such, no special privileges are being granted by the approval

26

of this Variance. The Variance would allow the applicant to rebuild a single-family residence, as other property owners in the same vicinity and zone have been able to rebuild and/or remodel their properties."

Addressing this issue, the Eskelands advance an argument premised on their interpretation of the municipal code, which we have discussed at length above. Specifically, the Eskelands contend that the municipal code does not permit a property owner to build a structure that would expand an existing nonconformity, and thus Scurlock is being granted a special privilege to violate the provisions of the municipal code that no other property owner has been granted. As we have explained, we reject the Eskelands' interpretation of the municipal code and thus also reject their argument that Scurlock has been granted a special privilege.

3.    *The Variance Does Not Constitute a Rezoning*

A variance may not be granted if it "[w]ould allow such a degree of variation as to constitute a rezoning or other amendment to the zoning code[.]" (Mun. Code, § 30.78.030, subd. (D)(3).) Addressing this requirement, the Planning Commission found, "The proposed Variance would not allow a variation which would constitute a re-zoning of the property since the proposed residential use is an allowed use in the R1-10 Zone."

The Eskelands contend that substantial evidence does not support this finding. Although their argument is difficult to follow, it appears to be summed up by their statement that "[t]he 'privilege' to obtain a front yard setback variance for an entirely new house because others have received some measure of flexibility in the setback, creates the *presumption* that an owner is entitled to encroach into the setback." (Italics added.)

27

We reject the Eskelands' position and conclude that substantial evidence supports a finding that the City did not de facto rezone the area or amend the zoning code by approving a variance for Scurlock's property. First, as the Planning Commission indicated, the fundamental characteristic of R1-10 zoning is that it allows residential uses, and Scurlock's variance does not alter that basic zoning designation. Second, the applicable standard focuses on the "degree of variation" to determine if a rezoning has occurred. (Mun. Code, § 30.78.030, subd. (D)(3).) Here, the encroachment permitted by Scurlock's variance is relatively insignificant. Scurlock has obtained relief from only a *single* zoning rule — the front yard setback requirement — and has obtained permission to encroach only into a *portion* of the setback, i.e., approximately 10 feet into the 20-foot setback. Third, because the evidence shows that only a small fraction of the homes in the R1-10 zoning area have been granted variances from the front yard setback requirement, the City did not effectively rezone the area by allowing Scurlock and other similarly situated property owners to encroach on the setback.

4. *Substantial Evidence Supports a Finding That an Alternate Development Plan Would Not Have Avoided the Problems Created by Complying with the Front Yard Setback Rule*

The Eskelands' final challenge to the sufficiency of the evidence relates to the municipal code provision that a variance should not be granted "if the inability to enjoy the privilege enjoyed by other property in the vicinity and under identical zoning classification: 1. Could be avoided by an alternate development plan[.]" (Mun. Code, § 30.78.030, subd. (D)(1).) Regarding this requirement, the Planning Commission found:

28

"Alternative development plans were studied and are limited because of the lot's topography, shape, location, public and private views, vehicular access, and surroundings. The Design Review Board and Planning Commission reviewed the project and found that the proposed residence has been appropriately sited to minimize adverse impacts to neighboring properties, public-rights-of-way, public and private views, steep slopes and open space on the subject lot. Looking at the various alternatives, the siting of the home with the front yard Variance was found to be the best alternative to achieve development that would preserve public and private scenic views, maintain open space, allow safe vehicular access, and minimize impacts to the steep slopes.

"As a result of the lot's topography, shape, location and surroundings, the most appropriate building area was identified to be the southeastern portion of the lot closer to the street along Seaview Avenue, generally where the existing home is located. As was determined by the Design Review Board, the Planning Commission also concludes that siting the structure farther to the north would result in unreasonable private and public scenic view blockage to the east[,] a walling-off of the street and result in privacy concerns for the northerly neighbors. Siting the structure farther to the west would result in adverse impact to steep slopes with additional bulk/mass of retaining walls, disturbance of existing landform and loss of open space, create a dangerous driveway, and result in privacy concerns for the southerly neighbor. As such, the Planning Commission determined that alternate development plans were studied but were found not to be appropriate given the constraints referenced above. The alternatives would result in more adverse impacts to the subject site, neighboring properties and community. The Planning Commission also determined the alternative plans to be inconsistent with the goals and policies of the Community Plan, specifically, the Environmental Element to preserve steep slopes and the Community Development Element to preserve public and private views. As such, development privileges enjoyed by others could not be avoided by an alternate development plan and the alternatives were determined to be more adversely impactful on the subject site and surrounding neighborhood."

The Eskelands argue that "because this is a complete[] replacement of an existing house, it strains credibility to claim that no other designs could have avoided the use of a variance." We reject this argument because it misconstrues the standard set forth in Municipal Code section 30.78.030, subdivision (D)(1). Under the plain language of that

29

provision, the inquiry is whether an alternate design *could have avoided the disadvantages* that stem from complying with the setback requirement. The inquiry is not — as the Eskelands appear to assume — whether Scurlock could have designed a house that complied with the setback requirement *regardless of the disadvantages.*

Applying the proper standard, substantial evidence amply supports the required finding that Scurlock could not have avoided the disadvantages if the house were designed differently. As we have discussed, there is substantial evidence that if the house was moved to the west as the Eskelands propose, Scurlock would be disadvantaged by the difficulty and expense involved with building on the steep slope; the dangerous and steep condition of the driveway; the unwanted impact to open spaces; and the unwanted appearance of bulk and mass. Therefore, the Planning Commission properly found that an alternate design would not avoid Scurlock's "inability to enjoy the privilege enjoyed by other property in the vicinity and under identical zoning classification." (Mun. Code, § 30.78.030.)

The Eskelands also repeat an argument we have already rejected, contending that the Planning Commission's findings are not supported by substantial evidence because "the project could easily be pushed back" to the west so that the house complied with the 20-foot setback requirement. Along the same lines, the Eskelands claim that the Planning Commission failed to consider any "truly alternative plans." We reject those contentions. As we have explained at length above and as shown by the Planning Commission's detailed findings, although the Planning Commission expressly considered the feasibility of moving the house to the west or to another part of the property to avoid the need for a

30

variance, the evidence supports a finding that it would be substantially more difficult and impractical to build a house on a different part of the property.

DISPOSITION

The judgment is affirmed.


_____
IRION, J.

WE CONCUR:


_____
BENKE, Acting P. J.


_____
HUFFMAN, J.

31

Filed 3/14/14

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STEPHEN ESKELAND et al., | D061370 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00083840-CU-WM-CTL) |
| CITY OF DEL MAR et al., | |
| Defendants and Respondents; | ORDER CERTIFYING OPINION FOR PUBLICATION |
| JON SCURLOCK, Individually, and as Trustee etc., | |
| Real Party in Interest and Respondent. | |

THE COURT:

The opinion filed February 19, 2014, is ordered certified for publication.

_____
BENKE, Acting P. J.

Copies to: All parties

32